T.C. Memo. 1996-86

UNITED STATES TAX COURT

ROBERT G. LESLIE AND MARILYN B. LESLIE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9814-87.          Filed February 28, 1996.

Elliott H. Kajan and Steve Mather, for petitioners.

Roger L. Kave, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FAY, Judge:  By notice of deficiency dated February 20,
1987, respondent determined deficiencies in petitioners' Federal
income taxes and additions to tax and increased interest as
follows:

| | | Additions to Tax and Increased Interest | | | |
| | | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6621(d) | 6653(a)(1) | 6653(a)(2) | 6661 |
| 1980 | $1,064,080 | [1] | $53,204 | -- | -- |

| 1981 | 49,501 | [1] | 2,475 | [1] | -- |
| 1982 | 366,677 | [1] | 18,334 | [1] | $91,669 |

[1]To be determined.

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

This case involves Robert G. Leslie's (petitioner's) investments in gold straddle transactions through the futures commission merchant F.G. Hunter & Associates (Hunter). This is the same Hunter tax straddle program that was at issue in Ewing v. Commissioner, 91 T.C. 396 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991).

On August 30, 1993, respondent filed a Motion for Order to Show Cause why petitioners' case is different than Ewing v. Commissioner, supra. On October 18, 1993, petitioners filed Petitioners' Response To Order To Show Cause. In their response, petitioners submit that their primary motive for engaging in gold futures transactions with Hunter is distinguishable from that of the taxpayers in Ewing v. Commissioner, supra. Based on petitioners' response, on December 6, 1993, this Court issued an order discharging the order to show cause. A trial was held January 10 and 11, 1995, in Los Angeles, California, to resolve the following issues for decision:

(1) Whether certain transactions in gold futures were entered into by petitioners for profit. We hold that they were not.

(2) Whether fees paid by petitioners with respect to such transactions are deductible. We hold that they are not.

(3) Whether petitioners are entitled to a deduction for the taxable year 1982 for the amount by which the Hunter straddle losses for the years at issue exceed the straddle gains for the years at issue. We hold that they are not.

(4) Whether petitioners, with regard to the Hunter straddle transactions, are liable for increased interest pursuant to section 6621(d). We hold that they are.

Respondent concedes that, based on the holding in Ewing v. Commissioner, supra, petitioners are not liable for additions to tax pursuant to section 6653(a)(1) and (2). Respondent further concedes that petitioners are not subject to an addition to tax for the taxable year 1982 pursuant to section 6661.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits associated therewith are incorporated herein by reference.

At the time petition was filed, petitioners resided in Santa Paula, California. Petitioners' joint Federal income tax returns for the years in issue were filed with the Office of the Internal Revenue Service at Fresno, California. Petitioners' returns were

prepared utilizing the cash receipts and disbursements method of accounting.

On their joint Federal income tax returns for the 1980 taxable year, petitioners claimed ordinary losses from Hunter transactions for the cancellation of long gold futures contracts in the amount of $1,530,268, and short-term capital gains for offset transactions of $198,030. Petitioners also claimed as miscellaneous itemized deductions for the taxable year ending December 31, 1980, the following costs relating to their partici- pation in Hunter transactions: Investment advisory fees in the amount of $14,000 and legal fees related to investments in the amount of $3,500.

On their joint Federal income tax return for the 1981 taxable year, petitioners claimed an ordinary loss from Hunter transactions for the cancellation of long gold futures contracts in the amount of $55,302 and net long-term capital gains from the assignment and offset of Hunter gold futures contracts in the amount of $97,160.

On their joint Federal income tax returns for the 1982 taxable year, petitioners claimed net long-term capital gains from Hunter transactions for the assignment and offset of gold futures contracts in the amount of $1,172,950.

All of the above claimed tax results purportedly occurred with respect to transactions in gold futures conducted during 1980, 1981, and 1982 in the manner hereinafter described on

behalf of petitioners by Hunter. Petitioners did not engage in the transactions as dealers.

Trading in Commodities Futures in General

A gold futures contract[1] is an agreement to either deliver (a short position[2]) or receive (a long position[3]) a specified amount of gold during a designated month at a price negotiated when the contract is made. The futures contract is ultimately fulfilled when the commodity bought is delivered to the buyer by the seller or when the contract is offset. Less then 5 percent of all futures contracts actually result in the delivery of the underlying commodity. Instead, most futures contracts are offset rather than being executed by delivery. Ewing v. Commissioner, supra at 400. An offset is the acquisition of an offsetting contract of purchase or sale of the same quantity of the commodity.

A gold spread consists of a long position and a short position, with each position having a different delivery date. Each of the two positions constitutes a simple spread, often

---

[1]Since modern gold futures trading began in 1974, gold futures have been traded on four domestic exchanges: (1) The Chicago Board of Trade (CBOE); (2) the International Monetary Market (IMM), which is associated with the Chicago Mercantile Exchange; (3) the Commodity Exchange, Inc. (COMEX), and (4) the MidAmerica Commodity Exchange. The dominant exchange is COMEX.

[2] A short position is held by a person who has sold one or more futures contracts without having previously bought them.

[3]A long position is held by a person who has bought and holds one or more futures contracts.

referred to as a "leg".  Id.  If a trader merely bought a long position or sold a short position, he would be said to have acquired a "simple net position", and the trader would hope to profit by a rise in the price of the commodity underlying the long position or fall in the price of commodity underlying the short position.  Traders who invest utilizing spread positions hope to profit by a favorable change in the price relationship or differential between their long and short positions.  The price differential is a function primarily of the changes in short-term interest rates and the value of the underlying commodity[4] and, secondarily, of storage and commission costs.  Since storage costs for precious metals are trivial, the major forces affecting gold futures spreads are gold prices and short-term interest rates.  Id.

A simple commodity spread that has one short leg with a nearby delivery date and one long leg with a more distant delivery date is often referred to as a "backward spread" since it is profitable when the dollar difference between the price of the two contracts increases after the position is established. Since prices generally increase in a rising or bull market, back-

---

[4]For example, if spot gold is $400 per ounce, and the interest rate is 1 percent per month, a 6-month delivery will be priced at $424 [$400 + (1 percent x 6 months x $400)].  Thus, when the number of long contracts equals the number of short contracts, the difference in price between the long and short legs is entirely a function of the interest cost of carrying gold from one futures delivery month to the other.

ward spreads are also referred to as "bull spreads".  Conversely,
a simple commodity spread that has a long leg with a nearby
delivery date and one short leg with a more distant delivery date
is referred to as a "forward spread" since it is profitable if
the dollar difference between the two contracts declines after
the position is established.  Since prices generally decline in a
falling or bear market, forward spreads are also referred to as
"bear spreads".

Since a forward spread profits when the difference between
the two contracts narrows, a forward spread will profit when the
interest rates decline.  Conversely, a backward spread would
suffer a loss from the same change in interest rates.  Addition-
ally, since a forward spread profits when the spread difference
narrows, a forward spread will profit from a reduction in the
price of gold even if the interest rates do not change.  Con-
versely, a backward spread would suffer a loss from the same
reduction in the price of gold.

Whenever a leg of a straddle is closed out by an offset, or
in any other manner, tax consequences normally will result in the
holder realizing either a gain or a loss.  Generally, in a tax-
motivated straddle trading, the loss leg will be closed out first
in order to generate a tax loss for the holder.  When this
occurs, the remaining leg of the initial straddle containing an
unrealized gain, which is usually almost identical to the amount
of loss in the closed leg, constitutes an open position for the

holder and thus is subject to the increased risk of being directly subject to the market. To minimize this increased risk, the holder would obtain a new position similar to the one in the closed loss leg, except for a different month. This substitution of one position for a similar position in a different month (switching) of the loss leg in the initial year in order to generate a tax loss which is offset by the unrealized gain in the other leg of the straddle is a pattern usually found in the trading of tax straddles. Ewing v. Commissioner, 91 T.C. at 401.

A "butterfly spread" has three legs maturing at different times. If the first and third legs are long, then the middle position is short. If the first and third legs are short, then the middle position is long. The outlying positions (first and third legs) are referred to as wings and the center position as the body, hence the term "butterfly".

The center position or body of a butterfly spread is twice as large as either wing, and the time periods for the delivery of the commodity from the first wing to the body and from the body to the second wing are equal. Essentially, a butterfly spread creates two spreads, one bullish and one bearish. Thus, a butterfly spread presents less chance of either an adverse or a favorable spread movement and is, therefore, less likely to result in a different loss or gain than an ordinary straddle. An example of a butterfly spread would be as follows:

                    WING                              WING
Short 50 Contracts of June Gold    Short 50 Contracts of October Gold

                              BODY
                  Long 100 Contracts of August Gold

A "condor trade" is similar to a butterfly spread but has four or more elements rather than three.  An example would be as follows:

                    WING                              WING
Short 50 Contracts of June Gold    Short 50 Contracts of December Gold

                              BODY
                  Long 50 Contracts of August Gold
                  Long 50 Contracts of October Gold

The purpose of butterfly or condor spreads is to establish a position that will create a significant profit or loss on the long or short position if there is a major move in the price of gold so a tax benefit can be achieved.  At the same time, such a spread establishes a position that creates a complementary profit or loss on the other side of the position, thereby creating tax benefits while eliminating the possibility of gaining or losing significant equity.

The Hunter Program

Hunter was organized in late 1979 or early 1980 as a Nevada limited partnership with its principal place of business in Newport Beach, California.  On February 20, 1980, Hunter first registered with the Commodities Futures Trading Commission (CFTC) as a Futures Commission Merchant (FCM) and remained an FCM for all years relevant hereto.  All regulated futures transactions

must be executed through an FCM which is a member of an exchange.
Since Hunter was not a member or clearing member of the Commodity
Exchange of New York (COMEX) or the International Money Market
(IMM), Hunter was not authorized to execute gold futures con-
tracts on the floor of either exchange.  Accordingly, Hunter
contracted with A.G. Becker, Inc., a clearing member of the
exchanges, to execute and clear the gold futures transactions
involved herein.

Hunter delivered promotional literature to prospective
clients.  A majority of the promotional material was devoted to
showing clients the "significant tax advantages" they could
obtain through the Hunter investment program.

Most of the "Questions and Answers" portion of the Hunter
promotional material relates specifically to tax benefits that
can be received by participating in the Hunter program.  Specifi-
cally, the materials state:

3.   Can I lose my investment?

Yes. As with any investment, the risk of loss is
commensurate with the opportunities for profit.
However, the opportunity for profit can be con-
siderably enhanced, and the risk of loss substan-
tially reduced by the proper choice of alternative
methods of liquidating your contracts.

\*      \*      \*      \*      \*      \*      \*

8.   How can the probability of gain be increased by
choice of liquidation methods (?) (See #3)

Income tax treatment of your gains or losses on each contract will be different depending upon the way your contract is closed out.  There are ways to close out a contract in which you have a gain so that it will be taxed as a long term capital gain.  For the contract in which you have a loss, you may liquidate so as to have ordinary loss.  Depending upon your tax bracket, your risk of after tax loss on both of these contracts will be very substantially reduced and will quite possibly be converted into an after tax gain.  Any net pre-tax profit will be significantly increased.

9.    <u>Can you give me an example</u> ?

On February 15, 1978, the price of November 1978 gold was $188.30 per ounce (Wall Street Journal, February 15, 1978 CMX). On the same date, the price of February 1979 gold was 192.30 per ounce. Seven months later on September 20, 1978, the price of November 1978 gold was $212.70, and the price of February 1979 gold was $217.90.  If you had sold November 1978 gold on February 15, 1978, and bought February 1978 gold at the same time then liquidated each contract on September 20, 1978, you would have incurred a loss of $24.40 ($212.70 - $188.30) per ounce on your short posi-tion and realized a gain of $25.60 per ounce on your long position.  Based on current tax rates, and upon the assumption that you close out your positions as described above, your net after tax gain on your February 15, 1979 gold would have been approximately $20.48 per ounce, and your net after tax loss on November 1978 gold would have been approximately $12.20 per ounce.  The combined after tax gain would have been $8.28 per ounce.  Considering there are 100 ounces of gold per contract your net dollar profit would be $828.00 per spread.  These figures do not include sales and administrative fees which will be discussed later.

10.   <u>What would have happened if I had bought November 1978 gold and sold February 1979 gold instead?</u>

On your long (November) contract, you would have a before tax gain of $24.40 per ounce, and on your

short (February) position a before tax loss of $25.60 per ounce.  Your after tax gain on the long contract would be approximately $19.52 per ounce, and your after tax loss on your short contract would have been approximately $12.80 per ounce, if you follow the liquidation principles described in the answer to question #9 above.  The combined after tax gain would be $6.72 per ounce, or $672.00 net after tax profit per spread.

11. <u>Would the same results be realized with other choices of dates</u>?

The results that would have been achieved with other choices of dates would be different. However, the principles are the same if these conditions apply.  (1) The contracts are closed out after the expiration of the six months capital gains holding period. (2) The contract on which you have a gain is closed out in a way which will qualify for capital gains tax treatment, and (3) the contract on which you have a loss is closed out in a way which will qualify for ordinary income tax treatment.

12. <u>Precisely how do I meet conditions (2) and (3) in question # 11</u>?

If there is a gain in your long position, you should qualify for capital gains treatment by going short in the same delivery month.  If you have a gain in your short position, you could sell it to an unrelated third party and qualify for capital gains treatment.  If you have a loss in either your long or short contract, you should cancel it.  If you do, your loss will be an ordinary loss rather than a capital loss.

*       *       *       *       *       *       *

15. <u>Will I be required to close out my long and short positions simultaneously</u>?

By no means.  They are separate contracts.  You may choose to liquidate them in other ways.  For example, you may wish to actually take delivery of the gold on your long contract and close out your short position by offsetting it with an identical long contract.  Other combinations of liquidation

are possible.  You should select the one that ful-
fills your economic goals and personal require-
ments.  Get the advice of your tax adviser.

Included with the promotional material are four graphs which show pre- and post-tax analyses of contract liquidation.  The promotional material also contained a "Worksheet" which specifically allows for calculating the "Tax Savings" of contract liquidation.

Also provided with the Hunter promotional material was a four-page document entitled "Summary of Federal Income Tax Consequences of F.G. Hunter & Associates Investment Program", giving a synopsis of the different tax implications of various gold futures contract liquidation methods.

The Hunter promotional materials included a 24-page opinion letter, dated March 24, 1980, written by Attorney Avram Salkin. The opinion letter was supplemented on June 13, 1980, and modified on August 17, 1981, in light of the provisions of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172. The opinion letter described in detail, with supporting citations of case law and statutes, the tax consequences, which in, the opinion of Mr. Salkin, could be expected by Hunter investors from the liquidation of the component positions of their future straddles.

Petitioner's Business and Investment History

At the time of trial, petitioner was 62 years old.  Peti-
tioner graduated from high school in 1950 and enlisted in the

U.S. Army.  After being honorably discharged from the Army in 1953, petitioner entered the construction business.  Petitioner eventually became the president and sole shareholder of R&H Paving, Inc., a paving contractor.

Prior to making the commodity trades with Hunter, petitioner held various investments during the 1970's and early 1980's. Petitioner's basic requirement in an investment was a good cash-flow, in order to counter the cyclical nature of his construction business.  Petitioner was not averse to risk in an investment since he was accustomed to a considerable amount of risk from the construction industry.

Generally, petitioner relied on either Roy Tolson, an accountant and business adviser, or Joe Rasey, a business associate, to locate investments which satisfied his investment criteria.  Before making an investment, petitioner would personally analyze the transaction.

In June 1980, petitioner hired Donald Short (Short) to be his personal business adviser and controller for R&H Paving, Inc. Short was a certified public accountant (C.P.A.), licensed to practice in California.  Prior to being hired by petitioner, Short was employed by Edward White & Co., the C.P.A. firm that prepared petitioners' tax returns.  While Short worked at Edward White & Co., he prepared petitioners' tax returns.  Short testified that he was well aware of petitioner's tax position

during the years he prepared petitioners' tax returns at Edward White & Co. and for all the taxable years at issue.

Petitioner relied on Short to find investments that satisfied his investment criteria because petitioner did not have time to personally investigate all of the potential investments in which he was interested.  As part of Short's investigation of potential investments for petitioner, Short read books, articles, and periodicals relating to commodity trading which led Short to believe that this type of investment met petitioner's investment requirements.

Since neither Short nor petitioner had prior experience with commodity investments, Short searched for brokerage firms that had commodity departments.  Short searched for a commodity broker by contacting brokerage houses and persons he had worked for in the past, including Edward White & Co.  These sources led Short to Hunter and, in particular, to Russ Klein (Klein), who was employed by and in charge of Hunter.

Short met with Klein on three occasions before investing with Hunter.  Petitioner only attended the last meeting.  The initial meeting with Klein focused on commodity trading methods and a projected potential return of 25-47 percent.  Short believed that the Hunter trading methods met all of petitioner's investment criteria.  Additionally, Short believed that Klein would be able to educate him in commodity trading strategies in order to enable him to assume increasing degrees of control over

trading decisions in the future on behalf of petitioner.  Short
was very interested in the Hunter program and advised petitioner
of the substance of the initial meeting with Russ Klein.  Short
testified that he did not receive the promotional material nor
learn about the favorable tax benefits of straddle trading in the
Hunter program until his final meeting with Klein, which peti-
tioner attended.

Petitioner testified that he reviewed the Hunter promotional
material, including "Summary of Federal Income Tax Consequences"
and discussed the tax consequences of the Hunter program with
Short prior to making his actual Hunter investment.  Petitioner
did no further research regarding the Hunter program.  Petitioner
testified that he did not check into any of the credentials of
the individuals who wrote the Hunter promotional material.

Petitioner decided to make his investment with Hunter in
December 1980 based on the information Short obtained from his
meetings and conversations with Klein and due to repeated calls
from Klein urging him to make an investment with Hunter immedi-
ately.  Klein's reason for wanting petitioner to invest at that
time was that the volatility of the gold market presented an
opportunity for immediate tax benefits.  Short testified that
some of the considerations for investing in Hunter programs at
that time were to maximize profits during a volatile market and
to take advantage of the tax benefits.

Petitioner, as a participant in the Hunter gold futures spread program, would have been required to sign the following Hunter forms: (a) New Account Application; (b) Account Agreement and Risk Disclosure; (c) Risk Disclosure Statement; and (d) Current Policies and Fees, setting forth the commissions and fees payable by petitioner to Hunter. Petitioner testified that it was normal practice in his business to keep copies of signed documents. However, at trial, petitioner could not provide signed copies of any of the Hunter documents listed above.

Petitioner's initial commodity positions were created on December 1, 1980, when he made the investment. Petitioner paid an initial deposit of $178,500. Out of his initial deposit, petitioner incurred the following costs:

| | |
|---|---|
| Legal fee | $3,500 |
| Management fee | 35,000 |
| Commission to establish initial spread positions | 17,500 |
| Total costs | 56,000 |

Thus, petitioner's initial margin was $122,500 ($178,500 - $56,000).

Petitioner's trades with Hunter were initiated by FAX, Inc. (FAX), a registered trading adviser. In order for FAX to initiate trades between petitioner and Hunter, petitioner would have been required to sign both an "Investment Advisory Agreement" and a "Special Power of Attorney" authorizing FAX to trade

commodities.  At trial, petitioner was unable to provide signed copies of these documents and testified that he did not recall signing either of the documents.

The $35,000 management fee incurred by petitioner on December 1, 1980 (see above), was for FAX's services.  Short testified that he never investigated FAX because he felt that FAX was just part of Hunter and that the $35,000 fee was just being paid to Hunter.

Through Hunter, petitioner established two spreads on December 1, 1980.  The first was a simple bear spread consisting of a long position of 30 contracts of October 1981 100-ounce gold at a price of $723.80 per ounce and a matching short position of 30 contracts of February 1982 gold at $762.  The second position was an imperfect butterfly spread.  The first wing consisted of 70 contracts of April 1982 gold bought at $785.10.  The body was 145 short June 1982 gold, of which 70 contracts were sold at $804.50 on COMEX and 75 contracts at $803.50 on IMM.  The second wing was comprised of 75 contracts of September 1982 gold bought on IMM at $834.  The slight imperfection in the butterfly occurred because there were only 2 months between the first wing and the body, whereas there were 3 months between the second wing and the body; and because the June/September part of the spread consisted of 75 contracts, whereas the April/June part consisted of 70 contracts.

On December 10, 1980, petitioner's spread positions were modified as a result of a recommendation from Klein that the market was moving and that, by making additional trades, petitioner could realize substantial tax losses and be in a better position to later profit from the market movement. Short and petitioner approved the trades that resulted in a substantial tax loss on December 10, 1980.

On December 10, 1980, the three long positions (175 gold contracts) established on December 1, 1980, were all canceled, resulting in losses totaling $1,506,000. Petitioner's original equity in his Hunter account, however, was not significantly affected because the value of the three remaining short positions dropped about as much as the three liquidated long positions. The result was a total "open" profit that approximately equaled petitioner's closed transaction loss. Petitioner's open profit was protected by immediately replacing, on December 10, 1980, the 175 canceled long contracts with 175 new long contracts.

The new long positions established on December 10, 1980, consisted of 75 contracts of March 1982 gold at $685 and 100 contracts of August 1982 gold at $739.70. The resulting position in the account was an imperfect condor spread consisting of two long outside wings of 75 contracts of March 1982 at $685 and 100 contracts of August 1982 at $739.70 and the body consisting of two short positions, 30 contracts of February 1982 at $762 and

145 contracts of June 1982, of which 70 were established at $804.50 on COMEX and 75 at $803.50 on IMM.

Upon canceling the 175 gold positions on December 10, 1980, Hunter charged petitioner a cancellation fee totaling $15,520.14. As a result of the $1,506,000 tax loss, petitioner, for the tax year 1980, was able to offset net ordinary income from numerous sources totaling $1,449,151 and offset capital gains totaling $56,849.

On December 30, 1980, petitioner's position with Hunter was reduced by selling 21 contracts of March 1982 long position while at the same time liquidating 21 contracts of the June 1982 short position.

Short and petitioner were dissatisfied with the investment advisory services rendered by FAX, and in February 1981 they requested and obtained a refund of the $35,000 management fee, which was recredited to petitioner's account by Hunter in incre- ments of $28,000 and $7,000.

Short and petitioner continued to be dissatisfied with the services provided by Hunter. Accordingly, Short contacted Bill Kearney at Merrill Lynch to determine what commodity advising services were available from Merrill Lynch. Petitioner retained Merrill Lynch and invested $100,000 in an oil and gas investment in late 1981. Merrill Lynch earned a $6,000 commission from the investment.

Short left petitioner's employ for approximately 1 year during the second half of 1981 and early 1982. During Short's absence, petitioner continued his commodity trading activity through Merrill Lynch and expanded into trading bonds, stocks, and other commodities futures contracts.

Also during Short's absence, petitioner continued to maintain his accounts with Hunter, and, on December 31, 1981, four of the March 1982 long positions were sold at $409, creating a total loss in the amount of $110,400. Two of the contracts were disposed of by sale, for which petitioners claimed a long-term capital loss in the amount of $55,200 on their 1981 Federal income tax return. Two of the contracts were disposed of by "cancellation", for which petitioners claimed an ordinary loss deduction in the amount of $55,302 on their 1981 Federal income tax return.

To keep the number of long and short positions of the condor position balanced after the December 31, 1981, disposal of four long contracts, four short contracts of June 1982 gold were purchased at $422.55 for petitioner's account with Hunter. This purchase yielded a realized profit of $152,380. The December 31, 1981, liquidation of four short positions was treated by petitioner as an "assignment" to a third party, and the gain was treated as a $152,380 long-term capital gain on petitioners' tax return.

In January 1982 petitioner and Hunter continued to reduce the condor position. This was made necessary by the fact that all the remaining gold contract positions consisted of 1982 contracts and would have to be settled by delivery if held much longer. As a result of the impending delivery dates, petitioner liquidated 30 of the remaining long August positions on January 26, 1982. The repositioning resulted in an offset loss of $1,007,100, which petitioner treated as a long-term capital loss.

Also on January 26, 1982, an equivalent short position consisting of 30 contracts of February 1982 gold was liquidated, but, instead of being offset by a direct purchase on the trading floor of COMEX, the short position was "assigned". This assignment resulted in a profit of $1,149,450, which petitioners reported as a long-term capital gain on their 1982 Federal income tax return.

The liquidation continued on February 24, 1982, when 25 long March contracts were sold, and 25 short June contracts were assigned. Petitioner recognized an $802,500 loss from the offset of the March position, which he treated as a long-term capital loss. Simultaneously, petitioner recognized a $1,067,625 profit from the assigned short June position, which petitioner treated as a long-term capital gain.

On February 25, 1982, an additional 25 contracts on each side of the remaining spread position in the account were liquidated. Twenty-five long March 1982 contracts were offset at

a loss in the amount of $797,500.  Petitioner reported the loss as a long-term capital loss.  Twenty-five short June 1982 contracts were liquidated by assignment at a gain in the amount of $1,062,125.  Petitioner treated the gain as a long-term capital gain.

Petitioner liquidated his final positions with Hunter on May 26, 1982.  This resulted in an offset loss of $2,814,700 from the remaining long contracts and a gain from the assignment of the remaining short contracts of $3,315,550.  The loss was treated by petitioner as a long-term capital loss, and the gain was treated as a long-term capital gain.

Petitioners claimed on their 1982 joint Federal income tax returns that the results of their 1982 Hunter trades were net long-term capital gains from the assignment and offset of gold futures contracts in the amount of $1,172,950.

OPINION

## Losses on Straddle Transactions

The primary issue in this case is whether petitioners are entitled to deduct losses on the Hunter straddle transactions as claimed on their Federal income tax returns for the taxable years 1980, 1981, and 1982.  Resolution of the issue turns on the effect of section 108(a) of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 494, 630, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat.

2817. Hereinafter, our references to "DEFRA section 108" are to that section as amended, unless otherwise stated.

DEFRA section 108(a) provides as follows:

(a) General Rule. -- For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions--

(1) which were entered into before 1982 and form part of a straddle, and

(2) to which the amendments by title V of the Economic Recovery Tax Act of 1981 do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business.

By notice of deficiency, respondent determined that petitioner's straddle losses are not deductible under section 165(c)(2) because the transactions were not entered into for profit. Petitioners contend that their entire course of conduct before the investment, during the commodity trading with Hunter, and after the initial Hunter investment through the time of the investment with Merrill Lynch all reflect that petitioner's gold straddle transactions were entered into for profit.

Petitioners contend that all of petitioner's investment and commodity trades were consistent with his long-standing invest-ment history. They argue that petitioner's commodity spread trading was motivated primarily by petitioner's desire to find investments with a modicum of risk in exchange for a large cash

return on investment, and that tax benefits were purely coincidental.  We disagree.

This Court in Ewing v. Commissioner, 91 T.C. 396 (1988), stated that the phrase "entered into for profit" as used in DEFRA section 108(a) is to be interpreted by reference to the standard applied under section 165(c)(2).  Ewing v. Commissioner, supra at 417.  The Court in Ewing used the guidelines provided in Fox v. Commissioner, 82 T.C. 1001 (1984), to determine whether the Hunter gold straddle transactions were entered into primarily for profit.  Id.

In Fox v. Commissioner, supra at 1021, this Court concluded that section 165(c)(2) requires that profit be the primary motive if a loss from a straddle transaction is to be deductible.  The Court stated that profit need not be the sole motive for engaging in a straddle transaction, but that a mere incidental profit motive would be insufficient.  Id. at 1019 (citing Ewing v. Commissioner, 20 T.C. 216, 233 (1953), affd. 213 F.2d 438 (2d Cir. 1954)).  To determine whether a straddle transaction was entered into for profit, Fox provides the following guidelines:

(1) The ultimate issue is profit motive and not profit potential.  However, profit potential is a relevant factor to be considered in determining profit motive.

(2) Profit motive refers to economic profit independent of tax savings.

(3) The determination of profit motive must be made with reference to the spread positions of the straddle and not merely to the losing legs, since it is the overall scheme which determines the deductibility or nondeductibility of the loss.

(4) If there are two or more motives, it must be determined which is primary, or of first importance.  The determination is essentially factual, and greater weight is to be given to objective facts than to self-serving statements characterizing intent.

(5) Because the statute speaks of motive in "entering" a transaction, the main focus must be at the time the transactions were initiated.  However, all circumstances surrounding the transactions are material to the question of intent.  Ewing v. Commissioner, 91 T.C. at 418 (citing Fox v. Commissioner, supra at 1018, 1022).

Although petitioner testified that his sole motive for investing with Hunter was to obtain a profit, a majority of the circumstances surrounding the transactions points to the conclusion that petitioner's primary motive was tax benefits.

In determining petitioner's primary motive for entering the Hunter program, "greater weight is to be given to objective facts than to self-serving statements characterizing intent."  Ewing v. Commissioner, 91 T.C. at 418; Fox v. Commissioner, supra at 1022. The objective facts indicate that petitioner's primary motive was tax considerations.  Thus, after applying the Fox guidelines to

the facts of this case, we find, for the reasons discussed below, that petitioner did not enter into his straddle transactions primarily for profit.

First, although petitioner testified that Hunter representatives never told him that canceling a commodities position would give him an ordinary tax loss or that he could get long-term capital gain treatment on the disposition of a short sale position, it is clear that the objective facts contradict this testimony.

A majority of the promotional material was devoted to showing clients the significant tax benefits that could be achieved through the Hunter "cancellation" and "assignment" closing procedures. Petitioner testified that he read and received the Hunter promotional material which explained the tax benefits to Hunter's liquidation procedures. Also, many of the "Questions and Answers" portion of the Hunter promotional material related specifically to tax benefits that can be achieved through the Hunter program. Furthermore, other Hunter promotional material received and read by petitioner included graphs comparing pre- and post-tax analyses of contract liquidation, a worksheet specifically allowing for the calculation of "Tax Savings" of contract liquidation, and a four-page document entitled Summary of Federal Income Tax Consequences of F.G. Hunter & Associates Investment Program.

The Court in Ewing stated that the 24-page opinion letter, written by attorney Avram Salkin, was the most influential item in the Hunter promotional material. Ewing v. Commissioner, 91 T.C. at 418. Petitioner testified that he received and read the opinion letter along with the other promotional material. In contrast to the substantial discussion of tax benefits, the profitability of the Hunter program was neither seriously discussed nor quantified.

Second, petitioner's trades indicate a greater interest in the tax advantages of the Hunter program than in obtaining a profit. Petitioner's expert, Edward Horowitz, testified that the gold market was very volatile in December 1980 and that there is a greater potential to profit in a volatile market. Thus, Klein was correct in advising petitioner to enter the market at that time. Mr. Horowitz also testified that petitioner's modification of his straddle position on December 10, 1980, which resulted in a substantial loss, actually increased petitioner's profit potential. While the Court does not disagree with Mr. Horowitz's opinion that the modification of petitioner's straddle increased his profit position, the Court finds that the modification was motivated by a desire to obtain a tax benefit. Petitioner placed his first straddle positions on December 1, 1980, and then, only 9 days later, he modified his positions as a result of a recommendation from Klein that the market was moving and that, by making additional trades, petitioner could realize substantial

tax losses and be in a better position to later profit from the market movement.  Petitioner's modifications resulted in a $1,506,000 loss just before the end of the 1980 tax year.

Petitioner argues that "the mere fact that tax benefits were realized does not mean the tax benefits were the reason for the transaction."  However, "It is a fundamental legal maxim that the consequences of one's acts are presumed to be intended."  Fox v. Commissioner, 82 T.C. at 1022.  We find that petitioner, like the taxpayers in Ewing, "chose to 'cancel' the initial losing legs of his straddles before the close of the 1980 tax year so as to generate an ordinary loss."  Ewing v. Commissioner, 91 T.C. at 419.  Then, in the following year, on December 31, 1981, petitioner chose to assign the profitable legs of his straddles which resulted in a $152,380 long-term capital gain.

Thus, with an initial investment of only $178,500, petitioner attempted to offset $1,449,151 of his net 1980 ordinary income[5] with his $1,506,000 tax loss from the December 10, 1980, cancellation of his gold futures transactions, and, by closing out the profitable legs of his straddle positions on December 31, 1981, by means of assignments, petitioner attempted not only to defer his straddle gains to 1981 but also to convert ordinary income into 1981 long-term capital gain.

---

[5]Petitioner was also able to offset capital gains (after such capital gains had already been reduced by the 60-percent long-term capital gain exclusion) by the amount of $56,849.

Finally, the alternative liquidation techniques (i.e., cancellations and assignments) developed by Avram Salkin were used by Hunter to sell prospective investors on a scheme to achieve tax avoidance. Id. Specifically, the "cancellation" technique was devised so that its proponents could claim ordinary loss treatment rather than capital loss treatment. The "assignment" procedure was contrived so that Hunter investors could characterize straddle gains as long-term capital gains instead of short-term capital gains. However, to utilize these techniques and obtain their purported tax benefits, petitioner paid more in commissions and fees than he would have incurred had he liquidated his futures contract the usual way, by means of offset. Id. at 400, 419.

For example, under Hunter's "Current Policies and Fees" statement, petitioner was charged a fee of $15,520.14 for canceling 175 gold futures contracts on December 10, 1980. Had petitioner offset his 175 gold contracts instead of "canceling" those positions, his fee would have only been $1,750. The Court believes that petitioner was willing to pay substantially more fees to obtain ordinary loss deductions in the amounts of $1,506,000 and $55,200 for 1980 and 1981, respectively, especially since petitioners deducted the fees on their 1980 and 1981 Federal income tax returns.

For the reasons stated above, we hold that petitioners' motives in entering into these transactions, despite their

arguments to the contrary, were primarily to obtain substantial tax benefits.  As we stated in Ewing:

> "we are cognizant of the fact that tax planning is an economic reality in the business world and the effect of tax laws on a transaction is routinely considered along with other factors, but nevertheless we reiterate that 'tax straddling * * * transactions can hardly be said to number among congressionally approved, sanctioned, or encouraged responses to the tax laws."

Ewing v. Commissioner, 91 T.C. at 420 (quoting Fox v. Commissioner, supra at 1025).

Fees Paid With Respect to Straddles

Petitioners deducted the following fees paid to Hunter in regard to petitioner's Hunter transactions:

### 1980

| | |
|---|---:|
| Cancellation fees | $15,518 |
| Gold futures contract cost | 8,750 |
| Offset fees | 420 |
| Investment advisory fees | 14,000 |
| Legal fees investment related | 3,500 |

### 1981

| | |
|---|---:|
| Cancellation fees | 102 |
| Offset fees | 20 |

Petitioners contend that these fees were incurred in connection with the purchase and sale of capital assets.  As such, petitioners argue that these fees are capitalized and form part of the cost basis (for purchase commissions) and an offset against the selling price (for disposition commissions).  Petitioners cite section 1.263(a)-2(e), Income Tax Regs., and the cases of Spreckles v. Helvering, 315 U.S. 626 (1942), and Soeder

v. Commissioner, a Memorandum Opinion of this Court dated
Mar. 11, 1954. Petitioners state that, as part of the cost basis
and the selling price, such expenses form part of the loss from
the trading which is otherwise allowable under DEFRA section
108(c).

Petitioner's reliance on section 1.263(a)-2(e), Income Tax
Regs., Spreckles v. Helvering, supra, and Soeder v. Commissioner,
supra, is unfounded since both the regulations and the cases
cited deal with taxpayers who were involved in securities or
commodities transactions entered into primarily for profit.
Since we have found that petitioner entered into the Hunter gold
futures program in order to obtain substantial tax benefits, the
above-listed fees paid by petitioner constitute payments to
purchase tax deductions and do not form part of the cost basis of
petitioner's gold contracts or reduce the selling price of those
contracts. Therefore, the fees paid by petitioner are nonde-
ductible personal expenditures. Ewing v. Commissioner, 91 T.C.
at 421; Brown v. Commissioner, 85 T.C. 968 (1985), affd. sub nom.
Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988); Zmuda v.
Commissioner, 79 T.C. 714 (1982), affd. 731 F.2d 1417 (9th Cir.
1984); Houchins v. Commissioner, 79 T.C. 570 (1982); see also
Falsetti v. Commissioner, 85 T.C. 332 (1985).

The 1982 Deduction

Petitioners contend that, if the Court determines that the
spread transactions were not entered into for profit, DEFRA

section 108(c) allows petitioners to take a net out-of-pocket loss for 1982. The net out-of-pocket loss would represent the amount by which petitioner's straddle losses during the subject years exceeded his straddle gains during the subject years. Respondent contends that petitioners are only entitled to offset petitioner's straddle gains by straddle losses to the extent of his straddle gains. See Ewing v. Commissioner, 91 T.C. at 421.

DEFRA Section 108(c) provides as follows:

> (c) Net Loss Allowed.--If any loss with respect to a position described in paragraphs (1) and (2) of subsection (a) is not allowable as a deduction (after applying subsections (a) and (b)), such loss shall be allowed in determining the gain or loss from disposi-tions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle.

Further interpretation of DEFRA section 108(c) is provided by section 1.165-13T, Q&A-3, Temporary Income Tax Regs., 49 Fed. Reg. 33445 (Aug. 23, 1984), which states as follows:

> Q-3. If a loss is disallowed in a taxable year (year 1) because the transaction was not entered into for profit, is the entire gain from the straddle occurring in a later taxable year taxed?
>
> A-3. No. Under Section 108(c) of the Act the taxpayer is allowed to offset the gain in the subse-quent taxable year by the amount of loss (including expenses) disallowed in year 1.

This Court recently confronted this issue in Nolte v. Commissioner, T.C. Memo. 1995-57, and held that DEFRA section 108(c) entitles taxpayers to offset straddle losses only to the extent of straddle gains. The taxpayers in Nolte, like peti-tioner, were involved in the Hunter program.

Petitioners argue that <u>Nolte</u> relies on interpretive section 1.165-13T, Q&A-3, Temporary Income Tax Regs., <u>supra</u>, for the proposition that DEFRA section 108(c) allows the offset of disallowed losses only against subsequent gains. Petitioners contend that the holding in <u>Nolte</u> is incorrect for two reasons. First, petitioners believe that section 1.165-13T, Q&A-3, Temporary Income Tax Regs., <u>supra</u>, does not imply that disallowed losses may only offset subsequent gains. Second, section 1.165-13T, Q&A-3, Temporary Income Tax Regs., <u>supra</u>, is invalid to the extent that it implies a contrary result to the plain language of DEFRA section 108(c). Petitioners cite <u>Jackson Family Foundation v. Commissioner</u>, 15 F.3d 917 (9th Cir. 1994), affg. 97 T.C. 534 (1991), to support the position that an interpretive regulation is not followed when it "fails to 'implement the congressional mandate in a reasonable manner.'" <u>Id.</u> at 920 (citing <u>Pacific First Fed. Sav. Bank v. Commissioner</u>, 961 F.2d 800, 803 (9th Cir. 1992), revg. 94 T.C. 101 (1990) (quoting <u>National Muffler Dealers Association v. United States</u>, 440 U.S. 472, 476 (1979))). We disagree with petitioners' position.

Petitioners incorrectly contend that section 1.165-13T, Q&A-3, Temporary Income Tax Regs., <u>supra</u>, does not imply that disallowed losses may only offset subsequent gains. The plain language of the regulations states that result. Section

1.165-13T, Q&A-3, Temporary Income Tax Regs., <u>supra</u>, specifically states that "the taxpayer is allowed to offset the gain in the subsequent taxable year by the amount of loss (including expenses) disallowed in year 1."  Thus, the plain language of the regulations is clear that a taxpayer can offset gain in a subsequent year but does not state the taxpayer is entitled to a net loss deduction.

Petitioners also incorrectly contend that the Court's reliance in <u>Nolte v. Commissioner</u>, <u>supra</u>, on section 1.165-13T, Q&A-3, Temporary Income Tax Regs., <u>supra</u>, is unfounded; they argue that the regulation is invalid to the extent it reaches a result different from the congressional mandate of DEFRA section 108(c).  The Court in <u>Nolte</u> found that Congress designed DEFRA section 108(c) as a relief provision so that the Commissioner could not obtain a windfall by denying straddle losses and then having taxpayers recognize straddle gains resulting from the closing of a straddle.  <u>Nolte v. Commissioner</u>, <u>supra</u>.  Section 1.165-13T, Q&A-3, Temporary Income Tax Regs., <u>supra</u>, carries out Congress' mandate to allow straddle losses but only to the extent of, and against, straddle gains.

Therefore, we find that DEFRA section 108(c) and section 1.165-13T, Q&A-3, Temporary Income Tax Regs., <u>supra</u>, make it clear that petitioners are only entitled to offset their gains by the amount of the losses.  <u>Nolte v. Commissioner</u>, <u>supra</u>; see also <u>Ewing v. Commissioner</u>, 91 T.C. at 421.  Accordingly, petitioners

are not entitled to an additional deduction for their "net" loss in excess of straddle gains.

Increased Interest Under Section 6621(c)

Respondent seeks increased interest from petitioners pursuant to section 6621(c).  Rule 142(a).

Section 6621(c) applies where the Commissioner has established that there is an underpayment of at least $1,000 in any taxable year "attributable to 1 or more tax motivated transactions".  Sec. 6621(c)(2).  Section 6621(c)(3)(A)(iii) specifically includes any straddle as a tax-motivated transaction. Thus, since petitioner's Hunter straddle transactions were not entered into for profit, they are subject to increased interest under section 6621(c).

To reflect the foregoing, and the concessions made by the parties,

Decision will be entered

under Rule 155.