T.C. Memo. 1999-18


UNITED STATES TAX COURT


LEEMA ENTERPRISES, INC., ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  39476-85, 41343-85,    Filed January 28, 1999.
             41987-85,  4797-86,
             22921-86, 25313-86,
              8648-93.


Matthew D. Lerner, for petitioners in docket Nos. 39476-85,

41987-85, 4797-86, and 25313-86.

Maria Rivera, pro se in docket Nos. 41343-85 and 22921-86.

Matthew D. Lerner, Sidney J. Machtinger, and Lisa M.

Zarlenga, for petitioner in docket No. 8648-93.

_____

[1]     Cases of the following petitioners are consolidated
herewith:  Maria Rivera, docket Nos. 41343-85 and 22921-86; Leon
E. Richartz, docket Nos. 41987-85 and 25313-86; Leema
Enterprises, Inc., docket No. 4797-86; and K. Richard Keeler,
docket No. 8648-93.  Monex Corp. & Subsidiaries, docket Nos.
24251-92 and 16162-94, originally consolidated herewith, has been
resolved by agreement of the parties after trial, and stipulated
decisions have been entered therein.

Gary D. Kallevang, Wilton A. Baker, Kim A. Palmerino, and William H. Quealy, Jr., for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, Judge: These cases were assigned to Chief Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183.[2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

### OPINION OF THE SPECIAL TRIAL JUDGE

PANUTHOS, Chief Special Trial Judge: By timely notices of deficiency, respondent determined that petitioners in these consolidated cases are liable for deficiencies, additions to tax, and penalties as follows:

Leema Enterprises, Inc., docket No. 39476-85

| Year | Deficiency | Additions to Tax Sec. 6653(a)(1) |
|---|---|---|
| 6/30/80 | $432,667 | $21,633 |
| 6/30/81 | 1,100,399 | 55,020 |

Leema Enterprises, Inc., docket No. 4797-86

| Year | Deficiency | Addition to Tax Sec. 6653(a)(1) |
|---|---|---|
| 6/30/82 | $785,688 | $39,284 |

---

[2]   All section references are to the Internal Revenue Code, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.

### Leon E. Richartz, docket No. 41987-85

| | | Additions to Tax | |
|------|------------|----------------|----------|
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6661 |
| 1979 | $45,528 | $2,276 | --- |
| 1980 | 296,373 | 14,819 | --- |
| 1981 | 879,244 | 43,962 | --- |
| 1982 | 871,014 | 43,551 | $87,101 |

### Leon E. Richartz, docket No. 25313-86

| | | Additions to Tax | |
|------|------------|----------------|----------|
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6661 |
| 1983 | $67,501 | $3,375 | $6,750 |

### Maria Rivera, docket No. 41343-85

| | | Additions to Tax |
|------|------------|----------------|
| Year | Deficiency | Sec. 6653(a)(1) |
| 1980 | $57,648 | $2,882 |
| 1981 | 279,751 | 13,988 |

### Maria Rivera, docket No. 22921-86

| | | Additions to Tax | |
|------|------------|----------------|----------|
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6661 |
| 1982 | $45,823 | $2,291 | $4,582 |
| 1983 | 26,894 | --- | --- |

### K. Richard Keeler, docket No. 8648-93

| | | Additions to Tax |
|------|------------|----------------|
| Year | Deficiency | Sec. 6653(a)(1) |
| 1981 | $4,407,190 | $220,360 |
| 1982 | 1,533,276 | 76,664 |
| 1983 | 158,894 | 7,945 |
| 1984 | 3,065,654 | 153,283 |

Respondent has also determined that all petitioners are liable for increased interest on an underpayment attributable to a tax-motivated transaction as defined in section 6621(c).

The issues presented for decision are: (1) Whether the Treasury note/bond (T-bond) option activities, Treasury bill (T-bill) option activities, and stock forwards activities (a market for the future sale of corporate stock) of Merit Securities, Inc. (Merit), a subsidiary of petitioner Leema Enterprises, Inc. (Leema), lacked economic substance; (2) whether participants in Merit's T-bond option, T-bill option, and stock forwards programs had a profit motive; (3) whether participants in Merit's T-bond option, T-bill option, and stock forwards programs are liable for additions to tax pursuant to section 6653; (4) whether participants in Merit's T-bond option, T-bill option, and stock forwards programs are liable for the 120-percent interest rate for tax-motivated transactions pursuant to section 6621(c); and (5) whether petitioners Maria Rivera and Leon E. Richartz are liable for additions to tax pursuant to section 6661.

In docket Nos. 41343-85, 41987-85, 22921-86, and 25313-86, additional issues remain to be resolved. An appropriate order in these dockets, permitting the parties an opportunity to resolve the remaining issues, will be issued.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulations of facts are incorporated in our findings by this reference.

At the time the respective petitions in these cases were filed, the principal place of business of petitioner Leema Enterprises, Inc., was located in Tiburon, California; petitioners Leon E. Richartz and Maria Rivera were residents of Tiburon,

California; and petitioner K. Richard Keeler was a resident of Evanston, Wyoming.

Our use in this opinion of the terms "loss", "gain", "profit position", "spread", "straddle", "option", "market", "trade", and "transaction" is not to be construed as a finding that the transactions at issue are, or are not, valid for Federal income tax purposes. Rather, our use of those terms is only for convenience.

## I. Corporate Structure

Petitioner Leema was the parent of a consolidated group of companies that included Merit and Futures Trading, Inc. (FTI). Merit shared an office with Leema and its subsidiaries. In addition, Leema, Merit, and FTI shared the same computer system and employees. Merit was a registered broker/dealer throughout the period at issue. Leema had two additional wholly owned subsidiaries, Horizon Trading, Inc. (formerly Merit Trading, Inc.), and Omni Securities, Inc. During the years at issue, petitioner Leon E. Richartz (Dr. Richartz) owned the majority of Leema's stock; for some portion of those years petitioner Maria Rivera owned 15 percent of Leema's stock. Dr. Richartz was Merit's chairman of the board of directors.

Merit operated three over-the-counter markets, one for options to buy or sell T-bills, a similar market for options in T-bonds, and, subsequently, stock forwards.

### A. T-bill and T-bond Options

Late in 1979, Merit began its T-bill and T-bond option activity. T-bills and T-bonds represent debt obligations of the

United States. T-bills are non-interest-bearing short-term obligations with a maturity of 1 year or less. They are sold at less than face value; the discount reflects the fact that a period of time must elapse before the bill reaches maturity and the obligation is payable at face value. T-bonds are interest-bearing long-term obligations generally having maturities in excess of 10 years. T-bills and T-bonds are actively traded; their market values depend upon changes in interest rates. As a rule, the market value of a given T-bill or T-bond will decline if interest rates rise, and its value will increase if interest rates fall.

Merit's markets did not deal directly with T-bills and T-bonds. Rather, Merit dealt only with options. The two types of options that Merit sold were "puts" and "calls". A put option consists of a contract giving the holder the right to sell T-bills or T-bonds on a specific future date at a specific price. A call option is a contract which gives the holder the right to purchase T-bonds or T-bills on a specific future date at a specific price. The price of an option is referred to as a premium. The price at which the parties to an option agree that the underlying commodity would be sold is called the "strike" price. An investor who purchases or sells such a contract is said to have established a "position".

When an investor holds a contract or a series of identical contracts, he is said to have an "open position". Merit's investors did not establish open positions. Rather, Merit's options were sold only in the form of "spreads". A spread is a

hedged position composed of two substantially offsetting positions --for example, the <u>sale</u> of a contract for a put option together with the <u>purchase</u> of a contract for a put option--called a "put spread". Each of the offsetting positions is called a "leg" of the spread.

In an open position, price changes in the underlying asset directly affect the value of a futures contract. In the case of a spread, the holder is both a purchaser and a seller of the same asset. Accordingly, when there is a change in the market price of the underlying asset, the price of each leg changes; one leg appreciates while the other depreciates.

The movements in each leg do not necessarily equal those in the other, and the price differential between them could change. A gain or loss will be incurred if the price differential widens or narrows; there will be no gain or loss if the spread remains constant. The profit or loss potential of a spread is measured by the increase or decrease in the price differential between the legs. Owning a spread involves less risk than owning an open position because the spread is less volatile than the price of either leg. Therefore, the profit potential of a spread is less than that of an open position.

Initial positions in the Merit T-bill option market took the form of "combination spreads". A combination spread involves acquiring a put spread and a call spread at the same time. Each put spread and call spread consists of two options--one bought and one sold--on the same underlying T-bill. A combination spread

further limits the risk to an investor, because the price differential between the legs of one spread would have to change with respect to the price differential of the legs of the other spread before there would be a net economic effect.

### (1) Merit's Nominal Pricing Formula

Because there was no publicly traded T-bill options market, Dr. Richartz engaged Dr. Leonard Auerbach to develop a pricing system for the options. Dr. Auerbach has taught at the University of California at Berkeley, the University of Southern California, and St. Mary's College. Dr. Auerbach adapted the Black-Scholes model formula for pricing stock options as the basis for devising a pricing formula for Merit's T-bill and T-bond options. The Black-Scholes formula determines stock option values on the basis of the price of the underlying security, the length of the option, the strike price, the risk-free interest rate, and volatility. See Black & Scholes, "The Pricing of Options and Corporate Liabilities", 81 J. Pol. Econ. 637 (1973). Dr. Auerbach developed and repeatedly revised a formula for Merit which could be used to calculate a price estimated to be equal to the price that would have applied in an open market.

### (2) Merit's Income Structure

Merit earned income from operating its option markets in two ways. First, it collected a bid/ask differential on opening positions. The bid/ask is the difference between the price a dealer will pay for an item and the price at which he will sell that item. The difference between the price paid to purchase an

item and the price received for selling it constitutes profit to the dealer.

Secondly, Merit retained the interest earned on the margin deposits that it required from its customers. "Margin" was the amount of money deposited by both buyers and sellers of Merit's contracts to ensure their performance pursuant to the terms of those contracts. "Initial" margin is the minimum deposit required when a position is established, and "maintenance" margin is the money that an investor must maintain on deposit to allow the investor to continue to hold that position.

Merit insiders--so-called market makers--were not required to pay the bid/ask price, and they were allowed to retain the interest earned on cash they had deposited as margin with Merit.

### (3) Trading in Merit Options

The options that Merit dealt with in its T-bill and T-bond activities were available only through Merit. No participant in the Merit T-bill or T-bond activity ever took delivery of any T-bills or T-bonds with respect to this activity.

The options traded over the Merit option markets were not listed on any formally organized exchange. Nor were these instruments registered with the Securities and Exchange Commission; rather, Merit marketed its instruments as private placements. Under Federal securities laws, a private placement can be offered only to high-income, sophisticated investors and to investors represented by qualified advisers. In order to trade in the marketplace, a potential participant had to fill out a

questionnaire indicating the participant's qualifications to participate in the Merit markets.

The officers of Merit believed that the margin requirements for their option trades were governed by Regulation T, Credit by Brokers and Dealers, 12 C.F.R. pt. 220 (1998), promulgated by the Federal Reserve Board pursuant to the Securities Exchange Act of 1934 as amended, 15 U.S.C. sec. 78g (1994). Under Regulation T, the margin requirements for "open" T-bill options are higher than the deposits required as margins for offsetting spread positions. It was not feasible for Merit to offer open positions, and it offered only spreads.

Merit provided a private placement memorandum (PPM) to each of its T-bill option investors. This document informed potential investors that "among other considerations, there are material income tax considerations involved". The section "Federal Income Tax Aspects" contained the advice that T-bills--

> are expressly excluded from the definition of a capital asset under section 1221(5) of the Code. Accordingly, based on the provisions of Sections 1234(a) and 1221 of the Code, gain or loss recognized by a holder of an Option resulting from the sale or exchange (including the expiration) of such option would be recognized as ordinary income or loss.

The PPM further advised that "gain or loss recognized by a writer resulting from the sale of T-Bills pursuant to the exercise of a call by the holder would be taxable as ordinary gain or loss". Further, it advised that--

> In the event a T-Bill is determined not to constitute a 'security,' * * * gain or loss realized by a writer of a T-Bill option, which is attributable to the lapse of the

option or any other closing transactions with respect thereto, should be treated for tax purposes as ordinary gain or loss.

In practice, Merit's trades were placed by "investment advisers", a few individuals who traded for their own accounts or as advisers for certain of their customers. These included, inter alia, Dr. Richartz, Chris Carabini (for Monex Corp.; see supra note 1), Edward Seykota, Donald Haberlein, and Albert Alessandra.

In 1979, Merit's personnel designed a computer system with connections to the trading advisers' offices. Merit developed and made available to its customers or their advisers computer programs to assist them in analyzing possible positions. Merit's computer system enabled it to keep accurate track of the daily trades and margin requirements, as well as a record of its customers' realized and unrealized gains and losses. The computer system enabled advisers and customers to analyze their trading positions and to show the income tax consequences of the possible trading positions. Merit's computers could also be used to develop new programs.

Merit required an initial margin deposit of $25,000 upon opening an account. It also required customers to deposit sufficient funds as a "maintenance margin".

#### (4)  Actual Initiation of Trades

#### (a)  T-bill Transactions

A trade on the Merit markets began when an investment advisor would contact Merit employees to seek a certain trading position for himself or his customers. The parties would discuss the interest rate to be used in pricing their options and, if before 11

a.m. Pacific time, would agree to an adjustment to conform to the interest rate in effect at 11 a.m.--the close of the trading in New York that day. If the discussion took place after 11 a.m., then the price would be based upon the next day's close. Merit would adjust the 11 a.m. interest rate by the basis point adjustment the parties agreed to, and it would price the options accordingly. In actual practice, premium values stayed the same, while strike prices were adjusted. Merit calculated its clients' gains or losses on the basis of changes in premium values over time.[3]

---

[3]     The mechanics of such trading are complex. A simplified  example comes from examining one leg of the T-bond trading of one of Merit's clients. On Dec. 12, 1980, the client purchased 285 put contracts each for T-bonds at a strike price of $815,000, paying a premium of $23,323 per contract. Twelve days later, on Dec. 24, 1980, the client sold 250 of the put contracts, receiving a premium of $2,635 per contract. He declared a loss  of $5,172,000, representing the net of the premiums--a minus $20,688 per contract--times 250 contracts.

Twelve days later, in his next taxable year, the client permitted the remaining put contracts to lapse at a loss totaling $816,305 (35 x $23,323 premium). Thus, his total loss on the purchased put contracts was $5,988,305.

Like all Merit customers, he had balanced each of the above transactions by maintaining an offsetting position in sold put contracts. Thus, on Dec. 12, 1980, the client, who had purchased 285 put options, also sold 285 put options on identical bonds. There were no transactions with these sold contracts until the exercise date of Jan. 5 in the next calendar year. On that date, the purchaser of the client's put options elected not to exercise those options. The client thus retained the premium he had received ($22,755 x 285), for a gain of $6,485,175. This more than offset his loss of $5,988,305 on his purchased put option position.

Like other Merit customers, the client had also hedged the effects of the put option spread by establishing an offsetting call option spread. This formed a combination spread. When the call option facet of the client's combination spread trades is

(continued...)

Merit initially organized its option customers into two groups--the A side and the B side. Members of the A side traded only with members of the B side, and vice versa.

Almost all of the trades for the 1979-80 tax year demonstrate what has been called an open-switch-close pattern. Six sets of orchestrated trades or trading sequences took place in the 1979 Merit T-bill option market. In each of these sequences, only 3 trading days were involved. The first occurred in the second week of December 1979, when all the investors "opened" a position by buying or selling an option spread from members of the other side. On December 28, 1979, all participants "switched" by buying or selling options that would offset the loss legs of their opening positions. In so doing, every investor in the T-bill program incurred a loss that was an ordinary loss for tax purposes.

Then, on January 4, 1980, in the subsequent taxable year, the investors acquired offsetting positions to close out their gain legs--or they allowed their options to expire unexercised. They incurred gains that approximated their taxable losses incurred a few days earlier, in the prior taxable year.

In 1980-81, trading in the Merit T-bill accounts was slightly more complex, but 23 of 27 trading sequences followed the open-switch-close pattern which took place shortly before and shortly after the end of the investors' taxable years.

---

(...continued)
figured in, he ended up with an overall economic loss of $205,930 in the trade sequence.

Of 76 participants in the initial Merit T-bill market, only one had a gain, of $961, at the end of the first taxable year of investing. Upon completion of their T-bill trading, only 12 of the participants had earned overall profits; however, these were generally very small.[4]

### (b) T-bond Transactions

Merit also offered a market in T-bond options for which it issued a separate PPM. This PPM advised that "there are material income tax considerations involved". The material under the heading "Federal Income Tax Aspects" provided an explanation of tax aspects of trading in options. It traced the provisions of Rev. Rul. 78-182, 1978-1 C.B. 265, which discussed trading commodity options on the Chicago Board of Exchange. It discussed the "special rules relating to the tax treatment accorded to the writer of an option on inter alia, securities such as T-Bonds". It explained that--

> gain or loss recognized by a writer resulting from the sale of T-Bonds pursuant to the exercise of a call would be taxable as capital gain or loss. Such gain or loss will be characterized as long-term * * * where the T-Bonds sold have been held for a period of at least one year * * *.

---

[4]     One notable exception was Case Enterprises, an offshore entity set up by the Carabini family, who also controlled Monex. In its first participating transaction, Case Enterprises deposited $1 million with Merit in September 1981, the last month of its fiscal year, incurring losses of $7,200, and in October 1981 (the beginning of its next taxable year), it withdrew $992,800. In September 1982, it again deposited $1 million, incurred substantial gains, and, 10 days later, in October 1982 (the beginning of its third taxable year), it withdrew $1,255,000.

The PPM further noted that upon a "closing transaction" any gain or loss was to be treated as short-term capital gain or short-term capital loss.

The Merit T-bond option market functioned similarly to the T-bill option market. The T-bond trades also featured an open-switch-close pattern. In the 1979 T-bond option market, there were two trading sequences. In each, only three trading dates were involved. The first occurred in the second week of December 1979, when each investor opened a position by buying (or selling) an option spread from a member of the other side. On December 28, 1979, every participant "switched" by buying or selling an option that would offset the loss leg of the opening position. This generated short-term capital losses for 1979. A few days later, but in 1980, each investor would buy or sell an offsetting position or allow the option to expire unexercised. For 1979, each T-bond investor realized a short-term loss.

In 1980, the pattern shifted. Some trade sequences followed the open-switch-close pattern, and others appeared to be selected to generate long-term capital gains.

For each participant, the first taxable year of T-bond trading produced substantial losses. Of the 25 accounts (other than Merit) in the T-bond option market between 1979-81, 9 made profits, generally in relatively small amounts.[5]

_____

[5] One notable exception was the case of Surya Trust. For 1979 through 1981, it posted T-bond option losses of $341,843 and $9,474,174.71 and a gain of $10,042,498.97, respectively. Its
(continued...)

B.  Stock Forwards

(1)  Formation

In 1981, Congress eliminated the tax advantages of straddling. It passed the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, sec. 508(a), (c), 95 Stat. 172, 333, parts of which operated to deny deductions for losses produced by tax straddles except to the extent that such losses exceed the unrealized gains retained for realization in the next taxable year.

In 1981, after enactment of ERTA, Merit decided to offer a market in forward contracts on selected listed corporate stocks. Stock forwards are contracts for the sale of shares of corporate stock at a specified future date for a specified price.  Merit's forward contracts were similar to its option contracts in that both involved agreements for the future purchase of a commodity.  In a forward transaction, however, one party agrees that it will be obligated to buy or sell marketable corporate stock at a future date (the settlement date) at a fixed price.  Merit's option contracts, in contrast, involved the sale of a right, but not the obligation, to buy or sell that commodity.

Merit's forward contracts were written on common stocks traded on the New York Stock Exchange or on the American Stock Exchange. In the stock forwards market, Merit functioned as a clearinghouse, whereby it was the opposite party to every transaction between customers in its market.  It did not take positions that exposed it

---

[5](...continued)
overall gain was $226,481.17.

to market risk.  Thus, Merit would find a willing party to take the opposite position for every position it sold or purchased.  Merit employees, as well as others recruited by Merit, functioned as market makers who would accept positions offered by non-market-maker customers of Merit.  These market makers took "assignments" of stock from other non-market-maker customers.  Often these parties were subsidiaries, such as Omni and Horizon, controlled by Dr. Richartz.

Although it ostensibly offered open positions in stock forwards, Merit traded only in spreads or combinations of spreads. In a stock forwards spread position, an investor would purchase both a long contract to purchase stock from Merit at a future date and specified price together with an equivalent short contract to sell the same stock to Merit at another future date and specified price.

A combination spread involved two spreads in different stock. Typically in one of the spreads, the long position matures before the short, while in the other spread, the short position matures first.  A combination spread in stock forwards in two different stocks operates as a hedge against adverse market moves. Differences between the relative performances of each of the spreads have an economic effect.

Merit issued a PPM for its stock forwards program, advising that the holder of a stock forwards position had three options for acting with respect to that position:  (1) The investor could hold

the contract to maturity and take (or make) delivery;[6] (2) he could

obtain Merit's "cancellation" of his position, thus freeing the

investor from his or her obligations under the contract; or (3) the

investor could engage Merit "as a broker" to sell the investor's

contractual obligation to some other participant.

The PPM noted the passage of the loss disallowance rules in

ERTA, but stated--

> Because the Forward Contracts presumably represent
> an interest in stock, and stock is excluded from the
> definition of "personal property", the Contracts should
> not constitute "positions" which are subject to the loss
> disallowance rules of Section 1092 of the Code.

The PPM also discussed "cancellations" and the possibility of

deducting losses from trading in stock forwards as ordinary income:

> Alternatively, an investor may, from time to time,
> negotiate with Merit to cancel his obligations under a
> particular Forward Contract, rather than sell or perform
> under such Forward Contract. Under these circumstances,
> such investor may take the position that losses, if any,
> realized upon the cancellation of a Forward Contract are
> ordinary losses, on the basis that a cancellation is not
> a "sale or exchange" for tax purposes * * *.

As with its earlier options markets, Merit generated profits

from its stock forwards program in two ways. First, it collected

a bid/ask differential on most opening positions. Second, it

retained the interest earned on customers' deposits in their

---

[6] The only documentary evidence of delivery of assets in any of the Merit markets pursuant to an option or forward contract was the delivery of Tandy stock to an investor in October 1983, which was redelivered the following month, and the delivery of Zapata stock to an investor partnership in November 1983.

trading accounts. Merit typically charged a bid/ask spread only on opening trades.

Customers of the stock forwards were required to make an initial margin deposit of $25,000. Customers were also required to post a "maintenance" margin during the time they had established a position. Like the option trades, Merit's stock forwards did not trade as outright positions in the stock forwards. All its trades took the form of spreads or combination spreads.

Most margin accounts had excess funds on deposit. In general, margin deposits were greater than the amount required. Moreover, these accounts were left with Merit longer than the clients' spread positions were open.

### (2) Trading in the Merit Stock Forwards Market

In order to trade, investors first had to fill out an offeree questionnaire in the PPM, and, if they lacked the requisite sophistication, their offeree representative was required to submit a questionnaire as well. Inexperienced traders were required to be represented in their trading by investment advisers. Of these advisers, at least eight traded their customers' accounts in the Merit stock forwards market--including petitioners Keeler and Richartz, and Messrs. Alessandra, Seykota, Haberlein, and Monex--as well as other customers who traded for themselves. There were 60 participants in the stock forwards market.

As was the case for its option markets, Merit used a demonstration model of its computer system to show potential customers how the stock forwards market worked. Merit disseminated

information about potential trades by giving customers and their advisers computer terminals with modems through which they could dial into Merit. Printouts from these terminals also informed customers of the status of their realized and unrealized gains and/or losses in the Merit stock forwards trading.

### (3) Nominal Pricing Formula

Merit instructed Mr. Auerbach to develop a formula to determine the initial price to be charged for stock forwards contracts. The formula was designed to replicate the price that would be offered in a freely competitive market. Mr. Auerbach created such a formula, taking into account the costs of holding the stock as well as the payment of dividends.

### (4) Actual Initiation of Trades

Merit's stock forwards market conducted trading activity from early in the morning until 11 a.m. Pacific time. Merit's personnel quoted the stock forwards prices to potential buyers as the differential between the prices of two legs of a spread. Thus, if the quoted forward price for a share of stock to be sold in May were $1 more than the quoted forward price for a share of the same stock to be sold in March, the quoted price of the spread was $1. Customers could seek to negotiate cents off the spread price. Trades would take place with Merit, which attempted to maintain a market equilibrium by taking offsetting positions with different customers, or with Merit insiders and market makers.

The final price was the price of the forward spread, based upon the 11 a.m. price of the stock. The price took into account

any agreed modifications of the spread price made earlier in the day of the trade or after 11 a.m. on the day before. Merit printed and provided to customers a record of transactions.

Forward spread positions had the potential for returning economic profits if the underlying stock market prices moved in advantageous directions.

Merit engaged an accounting firm that reviewed its system of control and records, finding them adequate. The accountants did not, however, audit each trade shown on Merit's books.

## II. Trading Activity of Individual Petitioners

### A. K. Richard Keeler

Petitioner Keeler is a professional trader who has traded commodities for his own account and for the accounts of clients. In all of such trading, Mr. Keeler has never taken delivery of the underlying commodity.

Mr. Keeler opened a T-bill option account on November 20, 1980. He deposited a $150,000 check with Merit and established a combination spread of options in Merit's account No. 139. On December 29, 1980, the T-bills were switched. As a result, Mr. Keeler's account reflected deductible option losses of $689,600, and unrealized gains of $667,685, carried over into the next year.[7]

---

[7] Mr. Keeler's taxable year 1980 is not at issue in this case, but the trading is set forth as background for the trades executed in 1981 and thereafter which are at issue.

### (1)  1981 Merit Transactions

Mr. Keeler closed out his option account in the opening days of 1981.  The account showed income of $1,657,260, taxable as short-term capital gains, and losses of $1,005,940, reported as ordinary loss deductions.  On February 3, 1981, Mr. Keeler withdrew his cash balance of $111,720.[8]  This ended his option trading with Merit.

After passage of ERTA, Mr. Keeler began his participation in the Merit stock forwards program.  On November 18, 1981, he deposited $700,000 with Merit and established six forward spreads in six different stocks.  In December 1981, he engaged in 17 taxable transactions.  One of those transactions produced a gain of $96,600, but all the other 16 produced losses, totaling $8,250,260 --including $1,100,620 in ordinary losses for "cancellations" and $7,149,640 in short-term capital losses.  Mr. Keeler's income tax return for 1981 indicated that these short-term capital losses operated to offset some $6,697,000 in gains from other commodity futures accounts.

Mr. Keeler's net realized losses from T-bill options and stock forwards in 1981, compared to his adjusted gross income in the same year, were as follows:

| A.G.I. Per Return | Merit Losses | A.G.I. w/o Loss | Loss % of A.G.I. w/o Merit Loss |
|---|---|---|---|
| ($3,660) | ($7,598,940) | $7,595,280 | 100% |

---

[8]    This was the amount remaining from the trading in the T-bill account, which had shown a net cash loss of $38,280.

## (2)  1982 Merit Transactions

Mr. Keeler retained unrealized gains of $7,970,300 from his 1981 stock forwards trades and carried them over into January 1982. At that time, Mr. Keeler engaged in trades which produced short-term capital gains of $7,984,320, and he withdrew his remaining cash balance of $434,060.[9]

For the next 5 months, Mr. Keeler made no trades in his Merit account. When he resumed trading in July 1982, he deposited $500,000; in November he deposited an additional $800,000; and in December he deposited an additional $300,000 (for a total of $1,600,000 cash deposited). In the latter half of 1982, Mr. Keeler established 36 spread transactions. Thirty-two of these made up "combination spreads" consisting of four straddles in two different stocks. The only taxable incidents in the account after January that year occurred in December 1982, when Mr. Keeler engaged in 43 taxable closing transactions. None produced any gain; all 43 produced losses, totaling $9,955,447. These losses consisted of cancellation losses of $2,725,268 and short-term capital losses of $7,230,179. Mr. Keeler used them to offset the long-term capital gain of $7,984,320 from trades executed the previous January.

Mr. Keeler's reported ordinary loss from T-bill options and stock forwards in 1982, compared to his adjusted gross income in

---

[9]     When Mr. Keeler's losses of $8,250,260 from T-bill option trading in 1980 are netted against his gains of $7,984,320 from T-bill option trading in 1981, the result is an overall loss of $265,940. This amount, subtracted from his original deposit of $700,000, produces the balance of $434,060.

the same year, was as follows:

| A.G.I. Per Return | Merit Losses | Loss % of A.G.I. w/o Merit Loss |
|---|---|---|
| $2,799,170[1] | ($2,725,268) | 97% |

[1] Mr. Keeler's adjusted gross income was the figure represented above. He deducted Merit stock forwards losses of $2,725,268 for that year, however, in effect reducing his income to $73,902.

### (3) 1983 Merit Transactions

Mr. Keeler retained unrealized income on the "gain" legs of his trading in the amount of $9,851,790 and carried it into 1983. The taxable incidents of Mr. Keeler's 1983 trading in Merit stock forwards, however, were very modest in comparison to those of the prior 2 years. His taxable transactions for that year took place only in November and December 1983; his taxable year ended with a net Merit trading loss of $35,230 of cancellation fees and an additional unrealized loss of $2,520. He did, however, report net profits of $630,446 from his profession of "investments". During 1983, Mr. Keeler established an additional 24 stock option straddles; in 20 of these he retained both the gains and losses and carried them into 1984. In 1983, Mr. Keeler neither added to, nor subtracted from, his cash margin account.

Mr. Keeler's net realized losses from T-bill options and stock forwards in 1983, compared to his adjusted gross income in the same year, were as follows:

| A.G.I. Per Return | Merit Losses | A.G.I. w/o Loss | Loss % of A.G.I. w/o Merit Loss |
|---|---|---|---|
| $621,480 | ($35,230) | $656,710 | 5% |

### (4)  1984 Merit Transactions

In January 1984, Mr. Keeler ended his participation in the Merit programs.[10]  In that month, he incurred short-term capital losses of $9,591,801 and had long-term capital gains of $19,180,297--including the $9,851,790 he had retained as unrealized capital gains from his trading in 1982.  He withdrew his cash balance of $1,197,891.  On his 1984 Federal income tax return, Mr. Keeler netted his capital gains against his capital losses and applied the 60-percent reduction for taxable long-term capital gains permitted by section 1202(a).  He reported taxable income of $5,079,712 and taxes of $2,505,189.  To this amount, he credited prepayments and credits of $1,740,800 and paid the resulting tax liability of $764,399.[11]

### B.  Leon E. Richartz

Dr. Richartz taught economics and finance courses at the University of Illinois and the University of California at Berkeley and coauthored a book entitled "Vertical Market Structures". During his academic career, Dr. Richartz began using computers to develop trading models in making markets more efficient.  Beginning in 1971, Dr. Richartz worked as a professional trader for his own account and for others. He also tried to earn additional

---

[10]    Sec. 101(a) of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 494, repealed the exception of stock from the loss disallowance rules of sec. 1092, effective for positions established after Dec. 31, 1983, in taxable years beginning after Dec. 31, 1983.

[11]    Sometime later Mr. Keeler filed an amended return seeking to apply carrybacks from 1985.

compensation through selling or licensing electronic marketing software that he had developed.

After he established Merit and its related companies, Dr. Richartz functioned principally as a market maker; he would take positions that a customer might wish to make, but for which there were no ready takers. Dr. Richartz would charge some "points" in the process. As a market maker Dr. Richartz received interest on his own excess margin deposits and paid no bid/ask premiums for his trades on the Merit markets.

Dr. Richartz maintains a personal account, designated account No. 51, in Merit's T-bill options activity. In 1979, he deposited $25,000 with Merit. His trading followed the same open-switch-close pattern as that of every other trader in Merit T-bills. It was opened on December 13, 1979, and switched 15 days later on December 28, 1979. The switch produced an ordinary loss deduction of $77,440 for Dr. Richartz's 1979 tax return. Dr. Richartz retained those positions in which he had a net unrealized gain of $78,080 and carried them for 4 days into the next taxable year when he closed the account. His realized losses from T-bill options in 1979, compared to his adjusted gross income in the same year, were as follows:

| A.G.I. Per Return | Merit Losses | A.G.I. w/o Loss | Loss % of A.G.I. w/o Merit Loss |
|---|---|---|---|
| $46,804 | ($77,440) | $124,244 | 62% |

In 1980, Dr. Richartz's trading was somewhat more involved. On January 4, 1980, he closed the 1979 trades he had initiated 3

weeks earlier, realizing a net gain of $1,048. On February 19, 1980, he withdrew the resulting $26,048 from his account and ceased trading in that account for several months.

In August 1980, Dr. Richartz opened a four-participant trade sequence, joining with Leema and an investment adviser, Mr. Alessandra, to take positions opposite Monex, which had a taxable year ended September 30, 1980. The trade closed on November 4, 1980. It produced $57,942 in ordinary losses for Dr. Richartz, as well as ordinary losses of $14,955 for Mr. Alessandra. The trades produced a taxable gain of $67,068 for Monex, but that amount was not recognized until its taxable year ended September 30, 1981.

Dr. Richartz performed no other T-bill trading until the end of 1980. He then participated in four other T-bill sequences, all opened and switched in December 1980. They followed the familiar open-switch-close pattern. Opened on December 5 and 17, 1980, none produced taxable gains that year. Instead, when the switches occurred on December 29 and 30, 1980, Dr. Richartz realized additional losses of $1,142,630. He carried unrealized gains of $1,155,550 for 5 days into his next taxable year, when these trading sequences closed. On the next day, he withdrew his cash balance of $105,276, representing a cash loss of $44,724.

Dr. Richartz included an ordinary loss from his T-bill options of $450,901 on his 1980 Federal income tax return. This loss, compared to his adjusted gross income in the same year, revealed the following:

| A.G.I. Per Return | Merit Losses | A.G.I. w/o Loss | Loss % of A.G.I. w/o Merit Loss |
|---|---|---|---|
| ($6,649) | ($450,901) | $444,252 | [1]99% |

[1] The parties agree that Dr. Richartz also reported short-term capital losses of $670,883 on his 1980 return. The statutory notice for 1980 did not disallow these losses.

Dr. Richartz was also a partner in an entity known as Peng Partners. Peng Partners maintained an account, designated account No. 41, in Merit's T-bill options activity. In 1979, Dr. Richartz reported from Peng Partners a guaranteed payment of a net $11,946, plus his proportionate share of partnership gains and losses. In 1980, he reported income of $37,105 and his proportionate share of Merit-related losses of $21,204.

### (1)  1981 Transactions

### (a)  T-bill Options

Early in 1981, Dr. Richartz realized capital gains retained from the prior year of $1,219,370. With the passage of ERTA, Dr. Richartz terminated his investments in the T-bill program. In July 1981, he deposited cash of $37,000 and engaged in his last option trades by opening and closing two sequences that produced a gain of $24,340. He accordingly withdrew $61,340.

### (b)  Stock Forwards

Dr. Richartz began trading in Merit's stock forwards in November 1981. He deposited cash of $1,068,880 and established spread positions in 12 separate trades. The next month, his "switch" transactions produced 17 taxable transactions in his stock forwards account for 1981--all were losses. For his stock forwards

account in 1981, Dr. Richartz incurred a net of $913,230 in ordinary losses and $1,713,090 in short-term capital losses, a total net loss of $2,626,320. During 1981, Dr. Richartz did not trade positions in which he had an unrealized gain of $2,656,440. Those he retained and carried into January 1982. On his 1981 Federal income tax return, his net realized ordinary losses from T-bill options and stock forwards in 1981, compared to his adjusted gross income in the same year, were as follows:

| A.G.I. Per Return | Merit Losses | A.G.I. w/o Loss | Loss % of A.G.I. w/o Merit Loss |
|---|---|---|---|
| $94 | ($952,710) | $952,615 | [1]100% |

[1] Dr. Richartz's Federal income tax return for 1981 also showed a short-term capital loss carryover from 1980 of $1,732.27 plus additional short-term capital losses of $3,426,248 and short-term capital gains of $4,436,741.

(2) 1982 Merit Transactions

In January 1982, Dr. Richartz engaged in stock forwards trades that produced short-term capital gains of $2,668,910. He withdrew his remaining cash balance of $1,111,470 in January and February. He made no trades in his Merit account until April. Dr. Richartz then deposited $25,000 into his account and in September deposited an additional $25,000. In 1982, he established 35 spread transactions. In these spreads, Dr. Richartz engaged in 23 taxable closing transactions. One of his trades resulted in a gain of $56,800, and his records reflect the receipt of "other" income of $3,807. The other 22 of these transactions, however, produced losses which totaled $4,499,307. These losses consisted of cancellation-fee ordinary losses of $191,792 and short-term capital

losses of $4,307,515.  They offset his long-term capital gain of $2,668,910 incurred in the previous January, leaving him with a net capital loss of $1,826,589.  This amount was used to offset other capital gains and to add to his capital loss carryover.

Dr. Richartz also retained and carried unrealized income of $1,857,057 in the "gain" legs of his 1982 stock forwards into his next taxable year or the year following.

Dr. Richartz's reported ordinary losses from Merit stock forwards in 1982, compared to his taxable income in the same year, were as follows:

| T.I. Per Return | Merit Losses | A.G.I. w/o Loss | Loss % of A.G.I. w/o Merit Loss |
|---|---|---|---|
| $2,887[1] | ($191,792) | $194,679 | 99% |

[1] Dr. Richartz's adjusted gross income was $208,894.  He deducted Merit stock forwards cancellation fees of $191,792 for that year, however, reducing his income by that amount.

### (3)  1983 Merit Transactions

In 1983, Dr. Richartz neither added to nor subtracted from his cash account for the stock forwards account.  He engaged in no taxable transactions until July.  At that time he began trading, and by November he had realized net short-term capital gains of $736,285 and long-term capital gains of $1,437,766.  In December 1983, however, he incurred cancellation losses of $65,448 and short-term capital losses of $2,234,054.  In that month, he realized an additional $55,342 in long-term capital gains, but the overall effect of these trades (including "other" income of $8,301) was to leave him with a net loss of $61,807 at the end of 1983.

Dr. Richartz's reported ordinary losses from stock forwards in 1983, compared to his taxable income in the same year, were as follows:

| T.I. Per Return | Merit Losses | A.G.I. w/o Loss | Loss % of A.G.I. w/o Merit Loss |
|---|---|---|---|
| $52,260[1] | ($65,448) | $117,708 | 56% |

[1] Dr. Richartz's adjusted gross income was $152,044. He deducted Merit stock forwards cancellation fees of $65,448, however, reducing his income by that amount.

Dr. Richartz continued trading in the stock forwards account for the next 2 years, which are not at issue here. At the end of his trading, he reported an economic profit from stock forwards trades of $103,089.

C. Maria Rivera

Petitioner Rivera is a native of Spain. She began trading with Dr. Richartz in 1971, making trades based upon Dr. Richartz's recommendations. When the Merit programs began, Ms. Rivera allowed Dr. Richartz to trade her account, understanding that he would use her account, like his own, as a market maker. Her Merit investments included trading in the T-bill options, T-bond options, and stock forwards contracts. As a market maker, Ms. Rivera received interest on her excess margin deposits and paid no bid/ask differential in acquiring her positions on the Merit markets.

During the period that Dr. Richartz actively traded her account, Ms. Rivera suffered from Addison's disease, a debilitating illness that makes it difficult to work for long hours or under

stress.  Ms. Rivera left the country during part of that period to recover from her illness.

### (1)  1980 Merit Transactions

### (a)  T-Bill Options

For her 1980 taxable year, Ms. Rivera claimed ordinary losses of $81,001 from T-bill option trades and capital losses of $408,527 from T-bond option trades.  The 1980 T-bill trade followed the yearend open-switch-close trading pattern. Her account, No. 203, was opened with the purchase of 24 put and 24 call options on December 17, 1980.  On December 29, 1980, 12 days later, the switch occurred by closing 22 of the contracts--each generating a loss-- and replacing them with new ones.  The switch terminations generated ordinary losses of $81,001.  The account maintained an unrealized gain of $80,985 a few days into 1981, her next taxable year.

### (b)  T-Bond Options

Ms. Rivera's 1980 capital losses arose from trading in her T-bond account, No. 189.  These also followed the open-switch-close pattern.  The account shows the purchase of 20 T-bond contracts in a combination spread on December 5, 1980.  The switch came on December 30, 1980, when the account closed out 17 contracts, generating a capital loss of $408,527.  She maintained an unrealized capital gain on her bond transactions of $423,538 into 1981.

Ms. Rivera's reported ordinary losses from T-bill options and stock forwards in 1980, compared to her taxable income in the same

year, were as follows:

| T.I.<br>Per Return | Merit<br>Losses | T.I.<br>w/o Loss | Loss % of T.I.<br>w/o Merit Loss |
|---|---|---|---|
| ($6,211) | ($81,001) | $74,790 | [1]108% |

[1] Ms. Rivera's adjusted gross income was $107,342. In addition to other deductions, she claimed an ordinary loss deduction of $81,001 on T-bill trades, reducing her income pro tanto. She utilized her capital losses as long-term and short-term carryovers.

### (2)  1981 Merit Transactions

### (a)  T-Bill Options

On January 5, 1981, Ms. Rivera closed her T-bill account, realizing a net gain of $80,955. On the entire transaction, she incurred a net loss of $45. Her T-bond account closed the same day, indicating proceeds of $426,959. Compared to her 1980 losses in this account, the overall trading produced a net gain of $18,432.

### (b)  Stock Forwards

In November 1981, a stock forwards account was opened in Ms. Rivera's name. This account, No. 667, reflected an initial cash deposit of $150,000; $51,400 was added in December. Trading in that account generated yearend short-term capital losses of $653,550 and yearend cancellation fees of $45,750, or a total loss of $699,300. The account maintained unrealized capital gains of $700,180 into January 1982.[12]

---

[12] The data in evidence does not make clear whether any of the trades that combined to produce the $699,300 loss was for an economic gain. There is no indication that any such gains were realized.

Ms. Rivera's reported ordinary losses from Merit trading activities in 1981, compared to her adjusted gross income in the same year, were as follows:

| A.G.I. Per Return | Merit Losses | A.G.I. w/o Loss | Loss % of A.G.I. w/o Merit Loss |
|---|---|---|---|
| $13,927[1] | ($63,176) | $77,103 | 82% |

[1] Ms. Rivera's adjusted gross income reflects ordinary losses from Merit trading totaling $63,176. This amount includes cancellation fees and $17,426 identified as "options" on her return. The capital losses appear to have been incorporated in her loss carryover.

### (3) 1982 Transactions

In January 1982, Ms. Rivera recognized the unrealized gains from her stock forwards account, now totaling $701,750. She withdrew her cash balance of $203,850, then deposited $10,000 in April and $14,035 in May. There was no trading in her account until July 1982. At that time, her trades generated capital losses of $245,484. In October, the account incurred capital losses of $313,483, and in December it incurred additional capital losses of $209,385, for a total of $768,352. These losses exceeded the $701,750 capital gains realized in the previous January by $66,602. She also incurred cancellation fees of an additional $35,877. The amount of the cancellation fees, $35,877, was added to her cash account. For 1982, all of her combined cancellation fees and losses from the account exceeded her gains--including an amount of $2,427 as "other" income--by $100,052. The account also retained an unrealized gain of $105,498 into 1983, plus a capital loss carryover of $123,570. These transactions, when compared to her

adjusted gross income for 1983, produced the following results:

| A.G.I.<br>Per Return | Merit<br>Losses | A.G.I.<br>w/o Loss | Loss % of A.G.I.<br>w/o Merit Loss |
|---|---|---|---|
| $50,599 | ($33,666) | $84,265 | [1]40% |

[1] Ms. Rivera's adjusted gross income was the figure set forth above. She deducted her cancellation fees, however, and when adjustments were made for the zero bracket amount, the deduction had the effect of lowering her otherwise taxable income by $33,666.

### (4) 1983 Transactions

In 1983, there was no activity in Ms. Rivera's stock forwards account until July. Thereafter, in trading during the last half of 1983, she realized losses of $317,463 and long-term capital gains of $532,276. The trading records indicate income of $218,468, including an item of $3,655 as "other" income. She retained unrealized gains of $211,116 and carried them into 1984. On her tax return for 1983, she applied the capital loss carryover of $123,570 from the previous year. Respondent disallowed the capital loss carryover. Taking into account the long-term capital loss deduction, the disallowance increased her adjusted gross income by $49,428. This amount, when compared to her adjusted gross income for 1983, produces the following results:

| A.G.I.<br>Per Return | Merit<br>Loss | A.G.I.<br>w/o Loss | Loss % of A.G.I.<br>w/o Merit Loss |
|---|---|---|---|
| $47,329 | ($49,428.40) | $96,775 | 51% |

### D. Leema Enterprises, Inc.

Leema, through its subsidiary Merit Securities, engaged in trading on its own accounts in the T-bill, T-bond, and stock forwards markets. The tax results of its trades appeared on the

consolidated Federal income tax returns filed by Leema, Merit's parent corporation. Leema and its subsidiaries, including Merit, report their income on the basis of a fiscal year ending on June 30. For taxable years 1980 through 1982, respondent disallowed losses reported by the Leema consolidated group with respect to Merit's transactions that gave rise to realized losses.

### (1) 1980 Transactions: T-Bond Options

Beginning in June 1980, Merit's T-bond option account, No. 111, engaged in two separate trading series, each of which featured the open-switch-close pattern of generating tax losses.

On June 11, 1980, Merit set up four straddles involving puts and calls in T-bonds in trade No. 210. On June 19, 1980, 8 days later, Merit set up four additional straddles involving T-bond puts and calls in trade No. 211. Six days later, Merit closed out the purchased call contracts in a "switch" in trade No. 211. The switch transactions generated short-term capital losses of $411,500.17[13] for Merit's 1980 taxable year. On June 27, 1980, 2 days later, Merit closed out the purchased call contracts in trade No. 210 by selling offsetting call contracts. This second switch in the T-bond options generated additional short-term losses of $435,235. For its 1980 taxable year, Merit's total T-bond option losses were $846,735.67. There were no realized gains.

---

[13] One trade in the switch transactions which gave rise to these losses generated income of $266.09.

(2)  1981 Transactions

(a)  T-Bond Options

In its next taxable year, Merit closed out its remaining T-bond option contracts and ended its participation in the T-bond program.  These transactions generated short-term capital gains of $1,091,479.16, or an apparent overall gain on T-bond trading of $244,742.

(b)  T-Bill Options

Merit's trading in T-bill options began later in Merit's 1981 taxable year.  Merit used four accounts.

By far the largest of Merit's T-bill trading volume--hundreds of trades with many of its customers--occurred in account No. 219. Merit opened account No. 219 on December 26, 1980, with 62 trades which constituted 31 spread transactions.  Merit's only taxable transactions during the calendar year occurred 4 days later, on December 30, 1980.  In one of two switch transactions, Merit realized a gain of $50,050 in a switch of 11 T-bill option contracts with a customer identified as RPV.  The other transaction yielded a loss of $18,236 in a trade with G & G Associates.

Many of the trades involving account No. 219 terminated early in January 1981, when Merit's customers realized the corresponding gains that related to their December losses and claimed deductions in their 1980 taxable years.  By January 7, 1981, Merit's cumulative realized gain in account No. 219 stood at $6,598. Account No. 219 remained inactive until May, and its realized gain figure remained at $6,598 until June 30, 1981.  On that date, the

last day of its taxable year, Merit engaged in transactions that produced realized yearend T-bill losses of $3,238,420. Twelve of these transactions were for losses; there was one gain transaction of $12,000. Merit retained and carried unrealized gains of $3,330,690 in account No. 219 into its next taxable year.

During its taxable year 1981, Merit traded in three other T-bill accounts, apparently as an accommodation to other customers' trades. Activity in Merit's account No. 133 began and ended between September and the end of November 1980. The trading left Merit with a realized gain of $144,860. The principal purpose of account No. 133 (and most of its profits) arose from its taking the other side of a trade in which Merit's customer, Monex, switched and closed a trade involving 1,650 call contracts. The switch, executed on September 26, 1980, generated a loss of $9,060,958.50 for Monex, whose taxable year ended 4 days later.

Merit's account No. 221 traded only over a 10-day period from December 29, 1980, through January 7, 1981. Merit realized a loss of $2,940. Its most notable activity was taking the other side of a trade in which Merit's customer Seykota switched and closed trades involving 1,500 put and another 1,500 call contracts. The switches, executed on December 31, 1980, generated losses totaling $9,345,000 for Mr. Seykota, whose taxable year ended that day.

Similarly, Merit's account No. 223 traded only over an 8-day period during the last week of December 1980 and the first week of January 1981. It traded with a number of customers. Its largest transaction arose from a trade on January 5, 1981, closing out a

customer named Milburn Partners at a loss of $119,000. At the end of trading, account No. 233 showed a profit of $7,466 for Merit.

### (3)  1982 Transactions

#### (a)  T-Bill Options

During its taxable year 1982 (beginning July 1, 1981), after passage of ERTA, Merit's T-bill operations slowed dramatically. It had only two clients, Case Holdings and Monex.[14] Merit closed out a number of its spreads, realizing carried-over gains of $2,774,360. Its accounts, reflected on Leema's 1982 Federal income tax return, show T-bill option trading income of $2,766,085, apparently reflecting the unrealized appreciations retained from trading in earlier years.

#### (b)  Stock Forwards

During its taxable year 1982, Merit's principal trading activity took place in its new stock forwards program. Merit's stock forwards account was account No. 601. Merit acted as the "other side" for its stock forwards clientele. The nonmarket makers had approximately 17,000 trades. At the end of its taxable year, Merit reported T-bill option income of $2,766,085 and "cancellation fee" deductions of $2,845,358.

Leema (Merit's parent corporation) had two additional wholly owned subsidiaries which engaged in stock forwards trading: Horizon Trading, Inc. (formerly Merit Trading, Inc.) (Horizon),

---

[14]    Case Holdings ended its T-bill trading in 1982. Merit continued to trade T-bill options with its single remaining customer, Monex, until 1988.

which maintained account No. 603, and Omni Securities, Inc., which maintained account No. 701. Horizon functioned as a market maker with respect to other traders. It traded for only 2 months at the end of 1981 and the beginning of 1982. During December 1981, it had cancellation-fee income of $26,347,590; the following month, in January 1982, it incurred cancellation-fee losses of $26,256,320. At the end of the taxable year, Horizon reported the $91,270 difference as income on Leema's consolidated return.[15]

## OPINION

These cases are part of a series of cases that examines the investment programs of Merit. We have addressed various aspects of these programs in other, previously issued opinions. See Lee v. Commissioner, T.C. Memo. 1997-172, affd. in part and remanded in part 155 F.3d 584 (2d Cir. 1998); London v. Commissioner, T.C. Memo. 1996-192; Alessandra v. Commissioner, T.C. Memo. 1995-238, affd. without published opinion 111 F.3d 137 (9th Cir. 1997); Lamborn v. Commissioner, T.C. Memo. 1994-515; Seykota v. Commissioner, T.C. Memo. 1991-234, modified T.C. Memo. 1991-541. None of these previous cases is dispositive of the current cases, which involve different petitioners and the holding of a new trial at which the parties presented different testimony and documentary evidence. We have accordingly addressed the issues in the present

---

[15] Leema's other subsidiary, Omni Securities, Inc., also functioned as a market maker, but it performed no trading in the stock forwards market until Leema's next taxable year.

cases de novo, and we have based our findings and holdings upon consideration of the evidence produced in these cases.

Issue 1.  Tax Straddles and Economic Substance

These cases involve various "spreads".[16]  With respect to the T-bill and T-bond options, a spread is a hedged position comprising two substantially offsetting option positions.  When the interest rate changes, the price of one leg of a T-bill or T-bond option will appreciate in value while the other will depreciate.

In the case of stock forwards, the spread consisted of a long leg--one for the sale of a corporation's stock at a specific future date--and a short leg--a contract for the purchase of an equivalent amount of that corporation's stock on a different future date.  Again, a change in the underlying stock price would cause one leg to appreciate, while the other would depreciate.

These spreads operated efficiently as tax straddles.  A typical tax straddle works as follows: first the investor simultaneously acquires offsetting positions.  These positions have different exercise dates, so that they do not cancel each other out.  As the market price of the underlying commodity changes, one leg will appreciate in value and the other will depreciate.  At the end of the investor's taxable year, he or she will sell the depreciated loss leg and replace it with a new contract.  The sale

_____

[16]    To be consistent with the parties' usage, we have described the offsetting positions as "spreads".  These positions, however, also come within the definition of the term "straddle" as that term is used in the Internal Revenue Code. See Katz v. Commissioner, 90 T.C. 1130, 1136 n.12 (1988); Perlin v. Commissioner, 86 T.C. 388, 391 n.8 (1986).

produces a tax-deductible loss in that year, but no corresponding gain. In the next taxable year, the investor will sell or close out the gain leg. Thus, the investor has not only obtained a current deduction but also deferred taxable gain on his or her investment into the next year. Presumably, if the investor is interested in further deferral, he or she could go back to the first step in the second taxable year and, in effect, move the taxable gain into a third taxable year.[17]

These tax tactics were subject to some added refinements. For example, the sale or exchange of a purchased ("long") option was deemed to have the same character as the underlying property. During 1979 through June 23, 1981, T-bills--the underlying property of the T-bill options--were excluded from the definition of a capital asset by then section 1221(5). Accordingly, investors reported losses upon the sale of purchased options as ordinary losses.

In 1981, Congress enacted ERTA. The explanation accompanying the legislation noted that "Congress was concerned about the adverse impact of Treasury bill straddles on Government tax revenues." Staff of Joint Comm. on Taxation, General Explanation

---

[17] In <u>Smith v. Commissioner</u>, 78 T.C. 350, 365 (1982), we stated:

> In fact, if petitioners' analysis of the tax law is correct, nothing but commission costs and death would prevent a taxpayer from perpetually straddling, achieving perhaps the ultimate tax goal of permanent deferral of taxation of an initial short-term capital gain. * * *

of ERTA, at 309 (J. Comm. Print 1981). ERTA removed the chief advantage of commodity straddling--that is, taking a loss on one leg the first year and deferring the cognate gain from the other leg into later tax years. Sec. 1092, added by ERTA sec. 508(a), (c).

The conference report explained that the new law "allows straddle losses only to the extent such losses exceed the unrealized gains on offsetting positions. Disallowed losses are deferred. * * * The loss deferral rule applies to actively-traded personal property (other than stock)". H. Conf. Rept. 97-215, at 258 (1981), 1981-2 C.B. 481, 513.

The same legislation repealed section 1221(5) with respect to obligations acquired after June 23, 1981, and subjected short-term governmental obligations to new section 1232(a)(3) (now section 1232(a)(4)). The new law thus eliminated the possibility of reporting ordinary losses on the disposition of options relating to Treasury bills.

After the enactment of ERTA, Merit began to deal in stock forwards. The PPM for its stock forwards advised that a forward position in stock is not subject to the loss limitations of ERTA. See Rivera v. Commissioner, 89 T.C. 343 (1987).[18]

This Court has often examined the tax aspects of straddles of futures or forward contracts for financial instruments. Where the

---

[18] Congress repealed the statutory provision that stock was not subject to the loss limitation provisions of ERTA in 1984. See supra note 10.

market is limited to transactions among the straddles' customers and the creator of the market, we have focused upon whether the purported transactions existed in substance. Freytag v. Commissioner, 89 T.C. 849, 876 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

The underlying issue in these cases is whether petitioners are entitled to deduct losses for various years between 1979 and 1984 resulting from their trading on the Merit T-bill, T-bond, and stock forwards markets. Respondent contends that even if petitioners' straddle transactions actually occurred, they lacked economic substance.

The economic substance doctrine was articulated in Gregory v. Helvering, 293 U.S. 465, 469 (1935), where the Supreme Court explained: "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended". The Court of Appeals for the Third Circuit has explained the Supreme Court's holding in Gregory as "settled federal tax law that for transactions to be recognized for tax purposes they must have economic substance. Therefore, economic substance is a prerequisite to the application of any Code provisions allowing deductions". Lerman v. Commissioner, 939 F.2d 44, 52 (3d Cir. 1991) (emphasis added), affg. Fox v. Commissioner, T.C. Memo. 1988-570.

The economic substance test involves an objective examination of the transactions at issue. The test is whether the substance of a transaction reflects its form and whether from an objective

standpoint the transaction was likely to produce economic benefits aside from a tax deduction. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990), affg. in part and revg. in part on another ground Larsen v. Commissioner, 89 T.C. 1229 (1987).

A review of the actual transactions and their characteristics demonstrates that the substance of the Merit transactions did not reflect their form. The form was the investment in financial products; the substance was the production of tax deductions.

A. Structure of the Merit Markets

Economically insubstantial tax-straddle programs are often characterized by trading exclusively in tax-advantaged assets and by stressing the tax-avoidance aspect of those assets. Realistic projections of actual economic returns, however, are notably absent. Fox v. Commissioner, 82 T.C. 1001 (1984); Leslie v. Commissioner, T.C. Memo. 1996-86, affd. 146 F.3d 643 (9th Cir. 1998).

Here, the principal attraction of the Merit markets plainly was the ability to generate tax deductions far in excess of the amounts invested. Merit's T-bills and T-bonds were both traded as options. Thus, yearend losses on T-bill options could be ordinary losses, which, unlike capital losses, could be fully used as deductions to reduce ordinary income from other sources.

Similarly, the T-bond options were created and traded in a way that they could produce capital losses and, in some defined circumstances, long-term capital gains. The T-bond PPM sets forth explicitly the provisions of Rev. Rul. 78-182, 1978-1 C.B. 265, which discuss the circumstances for generating tax advantages. To

a knowledgeable investor, T-bond capital losses would be useful in eliminating short-term capital gains that had been retained from spread transactions in prior years. Moreover, the long-term capital gains offered taxation at 40 percent of the rate applied to ordinary income.

The subsequently developed stock forwards had their own tax advantages, which Merit again set forth in PPM's. Merit advised that the forwards could be exempt from the loss disallowance provisions of ERTA, and thus, provide the traditional straddle opportunity for current deductions and postponed income. Moreover, although contracts for the sale of stock were capital assets in the hands of the investors, the promoters of Merit claimed that the disposition of those contracts would produce ordinary losses if the investors could arrange with Merit for "cancellation" of the contracts.

In contrast to the explication of tax benefits, none of the Merit programs depicted a realistic projection of the way in which investments would produce meaningful economic profit. The PPM's offered only abstract and technical discussions of spread strategies, but no detailed projections of realistic economic returns. No attempt was made to demonstrate the size and likelihood of profits, set forth in terms that take into account the pervasive combination spread structure, the amount of transaction fees, and the amount of forgone interest. The Merit programs instead show that their actual objectives were tax avoidance and not the realistic production of profits.

The tax-avoidance orientation of these tax straddles is reflected in the historic background of the offerings. <u>Fox v. Commissioner</u>, <u>supra</u> at 1016, 1017. In Merit's case, the T-bond and T-bill programs flourished until the effective date of ERTA in 1981, when Congress eliminated the tax benefits of trading option straddles. Merit's trading in options stopped suddenly, even though Congress had done nothing to impair the economic profitability of trading in options.[19] In the same year, however, Merit developed another tax-favored plan, claiming that its new stock forwards would provide the benefits of tax straddling that had been the focus of congressional disfavor in ERTA. Moreover, Merit advised that the resulting losses could be ordinary losses, because it could provide its customers with a "cancellation" of their contracts. It is clear that Merit was interested only in offering tax-advantaged instruments. When Congress removed the touted tax benefits desired by the Merit programs, Merit's interest in them dwindled, even though Congress did nothing to impair the economic viability of those programs.

Merit's restriction of its trades to spreads and combination spreads also indicates that its trading was designed for tax benefits and not economic gains. Two laws permit the deduction of straddle losses, Code section 165 and section 108 of the Deficit Reduction Act of 1984 (DEFRA), as amended by the Tax Reform Act of

---

[19] Even in the exceptional case, when investors reported appreciable economic earnings, they immediately terminated trading in those markets. See <u>supra</u> notes 3 and 4.

1986 (TRA), Pub. L. 99-514, sec. 1808(d), 100 Stat. 2085, 2817. Both require a "loss". If a transaction lacks economic substance, it cannot provide a basis for a deductible "loss". Lerman v. Commissioner, supra at 45.

Like other tax straddles, Merit trades appear to indicate that its investors had actually incurred substantial yearend losses. In reality, there were no such losses; the investors, who purchased only straddles, were substantially protected against the economic effect of actual losses by holding onto unrealized gains--gains that would be taxed only in the next year, or even later. Merit employed combination spreads--that is, two spreads, each of whose movements in response to a market shift would counteract the other. Combination spreads thus afforded even more protection against actual economic effects--whether losses or gains. Such tactics take unintended "advantage of the practical necessity of preserving the integrity of separate taxable years. Congress never intended such stratagems to prosper." Fox v. Commissioner, supra at 1027.

As petitioners point out, we have permitted the deduction of straddle losses incurred by profit-motivated individuals who trade consistently on established markets and hedge their positions. See, e.g., Laureys v. Commissioner, 92 T.C. 101 (1989). In those cases, however, we have been convinced that the taxpayers had primarily for-profit objectives and that the markets on which they invested possessed a potential for delivering meaningful profits. Petitioners have failed to make that showing.

B.  Trading on the Merit Markets

The lack of economic substance of the Merit trades is evident from an examination of the trades themselves.  Petitioners executed their trades for tax deductions, not for economic benefits.  Their tactics reveal many characteristics of tax-motivated, but economically insubstantial, tax-straddle trades.  Chief among these is the deliberate incurring of first-year losses.  In Glass v. Commissioner, 87 T.C. 1087, 1172, 1176 (1986),[20] we stated:

> The one consistent thread which runs through all of the cases consolidated in this proceeding is that losses, either ordinary or capital, were intentionally incurred in year one, followed by countervailing gains in year two or in many instances later as a result of rollovers.
>
> \*       \*       \*       \*       \*       \*       \*
>
> The intentionally realized losses in year one were not necessary or helpful in profiting from difference gains in  \*  \*  \*  [the taxpayers'] commodity straddle transactions.  Put in this light, the \* \* \* options strategy was "a mere device which put on the form of [\* \* \* option and futures transactions] as a disguise for concealing its real character," the obtaining of unallowable loss deductions.  As such, the \* \* \* options transaction lacked economic substance and was a sham. [Fn. refs. and citations omitted.]

---

[20] Glass v. Commissioner, 87 T.C. 1087 (1986), affd. sub nom. Bohrer v. Commissioner, 945 F.2d 344 (10th Cir. 1991), affd. sub nom. Lee v. Commissioner, 897 F.2d 915 (8th Cir. 1989), affd. sub nom. Kielmar v. Commissioner, 884 F.2d 959 (7th Cir. 1989), affd. sub nom. Dewees v. Commissioner, 870 F.2d 21 (1st Cir. 1989), affd. sub nom. Freidman v. Commissioner, 869 F.2d 785 (4th Cir. 1989), affd. sub nom. Keane v. Commissioner, 865 F.2d 1088 (9th Cir. 1989), affd. sub nom. Ratliff v. Commissioner, 865 F.2d 97 (6th Cir. 1989), affd. sub nom. Killingsworth v. Commissioner, 864 F.2d 1214 (5th Cir. 1989), affd. sub nom. Kirchman v. Commissioner, 862 F.2d 1486 (11th Cir. 1989), affd. sub nom. Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988), affd. sub nom. Herrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988).

In this case, the pattern of first year losses is unmistakable.

Mr. Keeler began with his T-bill investment in November 1980. His only taxable transactions that year were the sales of 80 T-bill contracts in December. Each produced losses. He left the T-bill market in February 1981. In November 1981, Mr. Keeler began his involvement with the Merit stock forwards. His only taxable transactions came in December of that year, when 16 of his 17 stock forwards trades produced losses. The pattern held true in the next year; in December 1982, he engaged in 43 taxable transactions, all resulting in losses. His trading was relatively quiet in 1983 and ended in 1984.

Dr. Richartz's trades reveal a similar pattern. His T-bill involvement began in November 1979, and his closings all took place in December of that year, generating losses of $77,440. In 1980, he engaged in some midyear trades with other Merit participants; those trades generated a small gain. In December, however, he disposed of 115 T-bill contracts, all for losses. He then invested in the stock forwards program beginning in November 1981. He made 17 trades in December, all for losses. At the end of 1982, he engaged in 23 stock forwards trades; 22 were for losses. His single gain transaction of $56,600 was vastly overshadowed by the losses of $4,499,307. His 1983 trading took place in the last half of that year, and by November he had more than $2 million in capital gains. In December, however, he eliminated this gain by taking losses, leaving his account at a minus $61,807.

Although the record does not provide as much detail concerning the trades of Ms. Rivera, they nonetheless indicate yearend loss-only transactions for 1980, when switches in her account generated a loss of $81,001 in T-bills and a loss of $408,527 in T-bonds. In 1981, she had stock forwards losses of $699,300; the summaries of her account offer no indication that any of her stock forwards trades generated gains. In 1982, she took losses in July, October, and December, eliminating her option gains incurred the previous January. Her trades in 1983 were confined to the last half of the year. Her records show a substantial profit going into the end of the year, but she reduced her gain to $218,468 in December by taking a loss of $536,985. She further reduced her gain by applying a capital loss carryover of $123,570.

Leema engaged in switch transactions shortly before the end of its taxable year; on June 19 and 27, 1980, its switch transaction in the T-bond option account yielded no gains but only losses of $846,735.67. Its first involvement with T-bills reflected modest changes in response to customer trading, but, on the last day of its taxable year, it engaged in 13 transactions, producing 12 losses and 1 gain. The net of this yearend trading was a loss of $3,321,822. Although the record lacks detail about Leema's last year in issue, its tax return indicates option income of $2,766,085 and cancellation fee deductions of $2,845,358.

A further indication of a transaction lacking economic substance is petitioners' consistent rolling of taxable income from one year into the next. This practice completed the "tax

centerpiece" of tax straddles--the closing of positions which produce losses for the first year and the movement of the offsetting gain to subsequent years by rollovers. <u>Krumhorn v. Commissioner</u>, 103 T.C. 29, 51 (1994); <u>Glass v. Commissioner</u>, <u>supra</u>. The Merit trades again show consistent patterns of such rollovers, with realized losses being taken in the first year and unrealized gains being rolled over so that they will not be taxed until the next year, or even later years.

Mr. Keeler's trading in the Merit T-bill program produced the following deferrals and rollovers:

| December 1980 | Realized loss | ($689,600) |
| December 1980 | Unrealized gain | 667,685 |
| January 1981 | Realized gain | 651,320 |

Trading in his stock forwards account showed a similar pattern, rolling gains from 1981 and 1982 into taxable status in 1984:

| December 1981 | Realized loss | ($8,250,260) |
| December 1981 | Unrealized gain | 8,207,410 |
| January 1982 | Realized gain | 7,984,320 |
| December 1982 | Realized loss | (9,955,447) |
| December 1982 | Unrealized gain | 9,851,790 |
| January 1983 | Realized gain | -0- |
| December 1983 | Realized loss | (35,230) |
| December 1983 | Unrealized gain | (2,520) |
| January 1984 | Realized gain | 9,588,496 |

Dr. Richartz's T-bill activity showed the following patterns:

| December 1979 | Realized ordinary loss | ($77,440) |
| December 1979 | Unrealized gain | 78,205 |
| January 1980 | Realized capital gain | 78,488 |
| | | |
| November/December 1980 | Realized loss | (1,200,273) |
| December 1980 | Unrealized gain | -0- |
| January 1981 | Realized gain | [1]1,115,550 |

[1]  Peng Partners indicated the same open-switch-close patterns which are indicative of a lack of economic substance.  Dr. Richartz's distributive share of Peng Partners' T-bill option losses are thus indistinguishable from his personal losses from T-bill option trading.

The pattern persisted in Dr. Richartz' stock forwards trading:

| December 1981 | Realized loss | ($2,626,320) |
| December 1981 | Unrealized gain | 2,656,440 |
| January 1982 | Realized gain | 2,668,910 |

As a market maker, Dr. Richartz entered into taxable transactions at various times in the last half of 1982 and 1983. The yearend results were as follows:

| December 1982 | Realized loss | ($1,826,589) |
| December 1982 | Unrealized gain | 1,857,057 |
| January 1983 | Realized gain | 668 |
| | | |
| December 1983 | Realized loss | (61,807) |
| December 1983 | Unrealized gain | 82,054 |
| January 1984 | Realized gain | 1,642,552 |

Ms. Rivera's T-bond and T-bill accounts also reflect the pattern of first-year losses and deferral of gains:

T-bills:

| December 1980 | Realized loss | ($81,001) |
| December 1980 | Unrealized gain | 80,985 |
| January 1981 | Realized gain | 80,956 |

T-bonds:

| December 1980 | Realized loss | (408,527) |
| December 1980 | Unrealized gain | 423,538 |
| January 1981 | Realized gain | 426,959 |

Her stock forwards account shows a similar pattern, with trades that rolled gains from 1981 and 1982 into taxable status in 1984:

| | | |
|---|---|---|
| December 1981 | Realized loss | ($699,300) |
| December 1981 | Unrealized gain | 700,180 |
| January 1982 | Realized gain | 701,750 |
| | | |
| December 1982 | Realized loss | (100,051) |
| December 1982 | Unrealized gain | 105,498 |
| January 1983 | Realized gain | 328 |
| | | |
| December 1983 | Realized gain | 218,468 |
| December 1983 | Unrealized loss | (211,116) |
| January 1984 | Realized gain | 103,376 |

The evidence in these cases provides less detail concerning Leema's trading than is available for the individual petitioners. Leema and Merit had taxable years ending on June 30. The available evidence shows losses and gains incurred through Leema's subsidiary, Merit, as follows:

T-bonds:

| | | |
|---|---|---|
| June 1980 | Realized loss | ($846,736) |
| June 1980 | Unrealized gain | -0- |
| July 1981 | Realized gain | 1,091,479 |

T-bills:

| | | |
|---|---|---|
| June 1981 | Realized loss | 3,227,296 |
| June 1981 | Unrealized gain | 3,330,690 |
| July 1981 | Realized gain | 2,774,360 |

Information regarding Merit's stock forwards trading is sketchy. Its tax returns reveal T-bill option trading income of $2,766,085 but stock forwards "cancellation fee" deductions of $2,845,358.

Petitioners urge that their intentionally realized first-year losses on their spreads were merely part of investment programs that extended over several years. Their evidence, however, falls far

short of demonstrating that these losses were "necessary or helpful in profiting from difference gains". Glass v. Commissioner, 87 T.C. at 1176. The actual trading records set forth above show that petitioners held their initial positions for a relatively short time before taking substantial losses. Moreover, the amount of losses taken was generally close to the amount of the next year's gains. These factors indicate that actual economic gains from changes in the spread positions were not significant and, in any event, were overshadowed by the tax losses that could be generated.

Two other factors which reflect lack of economic substance are a correlation of losses to tax needs, coupled with a generalized indifference to, or absence of, economic profits. Freytag v. Commissioner, 89 T.C. 849 (1987).

Mr. Keeler's tax returns indicate that his Merit losses, expressed as a percentage of his income before deduction of the losses, equaled 100 percent of his adjusted gross income in the first year at issue and 97 percent of his adjusted gross income for the second year. In the third year, his Merit losses were minimal, but the Merit program enabled him to defer taxation on income of approximately $9 million. It was not until the fourth year that he reported the substantial deferred income from the Merit transactions. In the meantime, his indifference to, and lack of, economic profits was marked. He persisted in the Merit programs, despite consistent economic trading losses which totaled $706,401.

Dr. Richartz's tax returns indicate that his Merit losses, again expressed as a percentage of income, equaled 62 percent of his

adjusted gross income in 1979, 99 percent of his adjusted gross income in 1980, 100 percent of his adjusted gross income in 1981, and 92 percent of his taxable income in 1982.[21] The percentage of Merit losses dropped to 56 percent of taxable income during 1983. His overall profit on T-bill options and stock forwards, after 6 years, was $59,413.

During the years in issue, Ms. Rivera's Merit losses, as a percentage of income, equaled 108 percent of her taxable income in 1980, 82 percent of her adjusted gross income in 1981, and 40 percent of her taxable income in 1982. Merit losses equaled 51 percent of taxable income during 1983. Her overall profit on T-bill and T-bond options and stock forwards during the years at issue was $1,102.

Leema's patterns do not lend themselves to this analysis because of its use of a subsidiary to engage in trading. Nevertheless, Merit's trades demonstrate multimillion-dollar losses which assisted handsomely in eliminating much of the other corporate income in Leema's consolidated returns.

The trading at issue is plainly tax motivated. Each of petitioners' trades reveals consistent first-year losses. All petitioners deliberately incurred these losses either to generate tax deductions or to create losses that would offset other gains. The taxable transactions that occur in the first year or first 2

---

[21] At times, petitioners gave effect to their Merit losses by deducting them instead of by making adjustments to gross income. In such cases, comparison to taxable income reveals the tax effect of those losses.

years are overwhelmingly trades that yield losses, not income. Moreover, the trading pattern shows consistent retention of unrealized gains to be carried into the next taxable year or years.

Petitioners claim that their trades were motivated by profit potential; any tax losses were incurred to take advantage of yearend opportunities. We do not accept this characterization. Petitioners have presented voluminous expert testimony, computerized charts, and printouts of past trading in support of their claims that the Merit trading was profit motivated. The pervasive flaw in these presentations is that they are taken out of the context of the total Merit trading. For example, petitioners state that Mr. "Keeler's account increased in value during January 1982, September, 1982, February 1983, April, 1983, June, 1983, August, 1983, September, 1983, and October, 1983." The context of Mr. Keeler's trades in those years shows, however, that the account decreased in value during the other unlisted 16 months of that 2-year period. The gain in January 1982 represented the reaping of rollover gains from the prior year's trades, but these gains were approximately $80,000 less than the prior month's (and previous taxable year's) losses. The gains from the other 7 listed months do not reflect any trading activity; they show only modest market fluctuations that resulted from application of Mr. Auerbach's algorithms used to create prices for the Merit markets.

Petitioners next contend that "Of his [i.e., Mr. Keeler's] combination spreads, from opening to closing, more than 25 percent were profitable." We are more impressed with the converse; that is,

that some 75 percent of his spreads lost money. Petitioners next add: "At the end of 1981, some of his closing transactions caused him to realize gains totaling $96,600." The record reveals that, at the end of 1981, Mr. Keeler's other closing transactions caused him to realize overall net losses of $8,250,260.

We have examined petitioners' many diagrams depicting each investor's range of profit possibilities in the Merit markets. They may well be individually accurate. Indeed, the realization of token profits in straddle transactions--where a loss in one leg is offset by a gain in the other--is not unexpected. It is a given that the straddle programs had the potential of generating a profit. Petitioners' demonstration, however, overlooks the fact that the straddle programs were more efficient at generating skewed tax deductions. Here the patrons of the Merit markets utilized them to generate tax deductions, not to earn economic profits. In rejecting similar contentions, the Court of Appeals for the Third Circuit explained the governing principle as follows:

> The potential for a profit existed but the taxpayers avoided making a profit by intentionally realizing losses in the first year which "were not necessary or helpful in profiting from difference gains in petitioners' commodity straddle transactions." * * * [Glass v. Commissioner, 87 T.C.] at 1175-76. * * * [Lerman v. Commissioner, 939 F.2d at 49.]

Nor are we convinced by petitioners' arguments that the Merit trades were not characterized by uniform results. Petitioners urge that, instead of uniform results, "some investors made money, some broke even, and some lost hundreds of thousands of dollars". However, when uniformity of results was needed--as in first-year

losses for tax purposes--the trades produced uniformity.  Of the 79
T-bill accounts, 4 were owned by Merit.  Of the other 76, only 1
made a first-year profit--in the amount of $961.  Moreover, three
of the four Merit accounts lost money as well.  In the T-bond
markets, all 26 investors incurred first-year losses.  In the stock
forwards market, all 52 investors incurred first-year losses.  In
all the programs, economic losses far outweighed the modest economic
gains.  In fact, only two of the non-Merit investors showed any
profits as a result of their overall stock forwards trading.[22]

C.  Other Factors in the Merit Markets

A number of other factors contribute to our conclusion that the
Merit programs lacked economic substance.  Merit set the prices and
controlled these markets, trading only with a small circle of savvy
trading advisers or sophisticated customers.  See Freytag v.
Commissioner, 89 T.C. 849 (1987).  These individuals were able to
keep up with the Merit program by using computer linkups.  Merit
employees provided computerized information sufficient to guide tax-
motivated trades.  The computer programs informed the advisers and
their clients of current losses and unrealized gains that could be
generated by any trade.

We have evaluated petitioners' demonstration that a number of
trades were executed for short-term capital gains instead of for

_____

[22]  Investor Hindshaw showed an overall trading gain of
$5,161 (account No. 631) but deferred the tax on $275,000 in
unrealized gains through 1982 into 1983.  Similarly, investor RPV
showed an overall profit of $6,365 (account No. 673).  It
deferred approximately $500,000 from 1981 into 1983.

generally more favorable long-term capital gains.  Such trading, they claim, demonstrates that economic profits, and not tax savings, were the object of the trades.  Again, petitioners have presented evidence of such trades without explaining their context--including the extent to which the short-term capital gains they incurred were offset by similarly artificial short-term capital losses.

Petitioners also contend that it is "simply not the case" that Merit's trading was characterized by uniform patterns.  Glossing over undeniable lockstep patterns of the early Merit markets, petitioners urged that Merit trading became "more and more idiosyncratic".  They indicate that the percentage of open-switch-close trades varied among the various accounts.  Petitioners' argument obscures the fact that, when Merit trades needed to be uniform for tax purposes, they were uniform.  The investors in each of the Merit programs uniformly incurred losses in their first years of trading.[23]  They then deferred taxable gains into subsequent years.  After posting first-year losses, they could afford to be more idiosyncratic in their trading.  Some investors--such as petitioners Keeler and Richartz in 1983--having begun a series of tax deferrals, chose to engage in very little activity.  Such inactivity does not require a finding that the trades were economically substantial.  In fact, during 1983, petitioners Keeler and Richartz, while generating little in terms of economic results, were deferring the reporting of millions of dollars of taxable

---

[23]  We have noted the single minor exception supra p. 14 and note 4.

income into 1984. Petitioners' actual trading patterns may indeed have become more idiosyncratic, but the trades still represented substantial tax avoidance.

Another indication of a lack of economic substance is the fact that the prices of the items traded on the Merit markets were not set by market forces. Instead, the prices were set by Merit itself, according to formulas derived by its employees. As was the case in Freytag v. Commissioner, supra, the parties have expended a great deal of time, energy, and resources in arguing the theoretical viability of Merit's pricing structure for options and forwards.

Those considerations are largely irrelevant. The loss legs of tax straddles presented the opportunity for large tax losses at the end of a taxable year. Economically, these are not losses at all, because they are balanced by the offsetting (but unrealized for tax purposes) gain legs. Thus, alleged negotiations between Merit and its customers as to the prices of the legs are not particularly significant, because the prices offset each other. We explained that point in Smith v. Commissioner, 78 T.C. 350, 379 (1982):

> Neither were petitioners' prices the product of an economically adversarial or tax-consequence adversarial process. While the relative prices of straddle legs are of great economic consequence to a straddle trader, the absolute prices have little or no economic significance. The buyer or seller of a straddle suffers no economic benefit or detriment by agreeing to leg prices above the market or below the market. To the extent that one leg is economically deprived of its true value by such pricing, the other leg's value is equally enhanced. * * * [Fn. ref. omitted.[24]]

---

[24] Moreover, the historic stock prices, rates, and

(continued...)

We thus decline petitioners' invitation to give effect to alleged negotiations that, compared to the manifest tax advantages, mattered very little to the parties. Petitioners' reply brief sets forth a detailed example of the effect of negotiations on the pricing of T-bills in trade No. 74. It focuses upon a combination spread between petitioner Keeler and another investor. In that spread, the formula strike prices per T-bill were $89.14 and $89.02 for the respective legs. Petitioners urge that negotiated changes produced actual prices of $89.01 and $88.89, respectively. They demonstrate that, if the market moved to a price of $89.05, the negotiations would produce an 18-cent change in the price of a T-bill option spread.

We accept that negotiations for strike prices could, in theory, produce an economic effect. Petitioner's example, however, fails to demonstrate that, from an objective standpoint, the transaction was likely to produce economic benefits aside from a tax deduction. See Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990).

The trading in account No. 74 began on November 21, 1980; it ended on January 5, 1981. During the 45 days of its existence, recorded trades took place on 3 days--the open-switch-close days. For petitioner Keeler, the results were as follows:

---

[24](...continued)
dividend data that Merit used to compute its formula prices are unavailable. Thus, the validity of the prices actually charged--to the extent it is relevant--cannot be verified.

| First-Year Tax Loss | Gain Deferred to Second Year | Overall Economic Cost | Economic Cost as Percent of Tax Loss |
|---|---|---|---|
| $689,600 | $667,685.40 | ($38,280) | 5.55% |

The above transactions reflect the actual economic substance of petitioner Keeler's investments in Merit's T-bill options. They demonstrate that tax deferrals were the object of the trades, and that there were no economic profits. The actual economic costs were minimal when compared with the tax deferrals; in reality, the economic losses represent a cost of obtaining tax benefits.

A more extensive examination of trade No. 74 underscores this point. Five investors, other than Merit itself, engaged in trade No. 74. Three of them, including petitioner Keeler, incurred economic losses, but the other two can show that their trades in trade No. 74 produced modest profits of approximately $3,000 each-- at least before commissions and forgone interest on margin accounts are taken into account. In the context of this single trade, these modest profits might be some evidence of economic substance. Petitioners have made such arguments, pointing out occasional positive changes in investors' Merit accounts. These arguments, however, do not hold up when they are considered in the context of the investors' total T-bill trading. With the exception of petitioner Keeler, four other non-Merit investors engaged in T-bill trading sequences in addition to trade No. 74. When all five investors' overall trading in the T-bill market is considered, the pattern of consistent yearend tax deferrals and overall economic profits becomes obvious:

| Trader | First-Year Deferral | Overall Economic Effect | Loss as Percent of Deferral |
|--------|---------|--------|--------|
| Timmons | $3,309,819 | ($165,087) | 4.99% |
| Walker | 9,917,243 | (367,560) | 3.71 |
| Rapien | 3,232,101 | (133,020) | 4.12 |
| Origlia | 1,520,610 | (77,390) | 5.09 |
| Keeler | 689,600 | (38,280) | 5.55 |

Ultimately, the record does not reveal any basis to conclude that the assertedly "negotiated" trades in issue were likely to produce economic benefits aside from a tax deduction.

Petitioners' citation of isolated instances of profitable transactions does not affect this conclusion. To the contrary, we have consistently held that "the fact that the entire transaction produces a nominal net gain will not impute substance into an otherwise sham transaction." Krumhorn v. Commissioner, 103 T.C. at 55. The Merit program, like other tax straddles, turned its back on the possibility of any meaningful profits, because its function was the generation of early losses and the postponement of any gain.

We also take note of Merit's practice of charging bid/ask only on the opening transaction. It may be questioned why the operators of a market would levy a charge only on the first use of its resources and, thereafter, permit its traders to operate free of charge. Here, the first trade was in fact only the first link in a prearranged chain of transactions. That is why a fee was charged only at the outset.

Similarly, Merit's consistent practice of retaining its clients' margin deposits in amounts larger than required--and for periods longer than trading took place--suggests that the deposits

served a purpose other than guaranteeing the investors' good faith. Merit kept the interest generated by these deposits, during a time when interest rates were relatively high. Merit insiders, however, such as Dr. Richartz and Ms. Rivera, were allowed to keep the interest on their own deposits. This practice suggests that the margins were used as a source of interest income for Merit and its insiders, and not as a basis for maintaining a valid market.

Additionally, there were no deliveries of the underlying commodity in Merit's history of trading options in T-bills and T-bond options and only two deliveries pursuant to forward contracts in corporate stock. This suggests that Merit was not dealing in valid trades, but rather only in made-up positions that could be balanced as Merit (or the investment advisers) desired in order to generate tax deductions or offsets. Petitioners argue that deliveries of the underlying commodities are the exception to the rule in commodity transactions, and they point out that contemporary derivative markets have no delivery of the underlying asset at all. We understand that, even on valid markets, most options contracts are offset and do not result in delivery of the underlying commodities. The fact remains, however, that evidence of a meaningful number of deliveries of the items sold on the Merit markets would have supported a finding that the markets possessed economic validity. Merit has made no such showing. Its evidence of two deliveries of stock (one of which was later undone) does not dissuade us from the belief that the thousands of other Merit transactions took place with no concern for delivery, or even the

existence, of the underlying commodities.  Merit was "playing a football game without the football".  See Price v. Commissioner, 88 T.C. 860, 884 (1987).

Petitioners' counsel have ably compartmentalized the elements of respondent's criticisms of the Merit program and then gone to work on each singly.  But in the end, we must bring all these elements together.  Treating the facts as a bundle, we cannot escape the conclusion that the Merit markets lacked economic substance. Although the form appeared as markets for particular financial instruments, the substance was the creation of straddles to generate loss deductions without corresponding economic losses.  From an objective standpoint, the straddles were unlikely to produce economic benefits aside from tax deductions.  In short, the Merit trades lacked economic substance and cannot support the losses claimed.  See Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990).[25]

## Issue 2.  Primary Profit Objective

Our holding as to economic substance may obviate the need to discuss at length the question of petitioners' profit motives; in

---

[25]    Petitioners contend that, to the extent their deductions are disallowed under the Merit programs because of a lack of economic substance, the corresponding income should be removed from taxable income as well.  We agree.  In a sham situation, we must give effect neither to the deductions nor to the income generated by the program at issue.  Sheldon v. Commissioner, 94 T.C. 738, 762 (1990); see Julien v. Commissioner, 82 T.C. 492, 498, 508-509 (1984); see also Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965); cf. DEFRA sec. 108(c), 98 Stat. 630, as amended by the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 1808(d), 100 Stat. 2817.

any event, we find that their motives were not primarily for profit. The laws that permit the deduction of valid straddle losses do so only "if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business". DEFRA sec. 108; see Code sec. 165. For a taxpayer to be in a "trade or business", the taxpayer's activity must have a "primarily for profit" motive. Polakof v. Commissioner, 820 F.2d 321 (9th Cir. 1987), affg. per curiam T.C. Memo. 1985-197; Zell v. Commissioner, 763 F.2d 1139 (10th Cir. 1985), affg. T.C. Memo. 1984-152. Thus, whether a taxpayer is in a trade or business or not, he or she must have incurred tax straddle losses in an activity engaged in primarily for profit.

Our time focus on a taxpayer's profit motive is at the time the taxpayer initiated his transactions. Nevertheless, all the circumstances surrounding the taxpayer's transactions, including the disposition of the options, are material to the question of the taxpayer's intent. See Fox v. Commissioner, 82 T.C. at 1022. We accord greater weight to objective facts than to a taxpayer's self-serving statements characterizing his or her intent. See id. In this regard, "It is a fundamental legal maxim that the consequences of one's acts are presumed to be intended." Id.

Here, the Merit investors who defend their investments were knowledgeable; many were insiders in the Merit markets. All were aware that spread transactions offered impressive tax savings while minimizing the risk associated with those savings. All were aware of the tax-advantaged nature of the assets being sold, such as T-

bills that would yield ordinary losses and stock forwards which promised ordinary losses with "cancellations". We believe that such investors would not invest in new and untried ventures in marketing options in Treasury obligations or stock forwards unless they would benefit from prompt and sizable tax deductions. Their arguments about economic possibilities are self-serving and unconvincing. The tax returns reflect that they accomplished what they set out to do-- obtain first-year deductions from their spread positions and postpone gains. Other objective facts, including the tax-flavored aspect of the instruments involved, their almost immediate disposition for tax losses, and the investors' substantial indifference to profits all combine to show that petitioners' primary objective was obtaining tax benefits. We, therefore, conclude that because petitioners lacked a "primarily for profit" motive, they failed to meet the statutory requirements for deducting the losses at issue.[26]

---

[26] We note that none of the individual petitioners have claimed coverage of the per se rule applicable to commodities dealers; that is, that any loss incurred "shall be treated as a loss incurred in a trade or business". TRA sec. 1808(d).

Citing cases such as International Trading Co. v. Commissioner, 484 F.2d 707 (7th Cir. 1973), revg. and remanding 57 T.C. 455 (1971), petitioner Leema argues that, as a corporation, it need not demonstrate that it was in a trade or business or otherwise engaged in an activity primarily for profit. Our conclusion that the Merit trades lacked economic substance vitiates any claim that petitioners might make under either the per se rule or International Trading Co. "[E]conomic substance is a prerequisite to the application of any Code provisions allowing deductions". Lerman v. Commissioner, 939 F.2d 44, 52 (3d Cir. 1991), affg. Fox v. Commissioner, T.C. Memo. 1988-570.

Issue 3.  Section 6653(a) Additions to Tax

We must additionally decide whether each petitioner is liable for an addition to tax under section 6653(a) for each of the years at issue.  Section 6653(a) provides that if any part of any underpayment is due to negligence or intentional disregard of rules or regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment.  Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  Krumhorn v. Commissioner, 103 T.C. at 56; Freytag v. Commissioner, 89 T.C. at 887.

In this case, Mr. Keeler, presumably an experienced trader, repeatedly invested in untried types of transactions with a small, new, and inexperienced company.  He invested in a program whose promoters invented and operated the markets involved and who created the prices for the market's commodities by computer, rather than by market principles.  He has demonstrated no objective basis for believing that the Merit programs possessed economic substance or that he proceeded with a primarily for-profit motive.  Mr. Keeler nevertheless did not hesitate to claim enormous tax deductions and deferrals.

Mr. Keeler urges that he studied the PPM's and gave them to his accountants and talked to Merit's principals.  We are not persuaded that these actions suffice to avoid the negligence penalty.

Reliance upon disinterested expert advice may satisfy the prudent person standard, but only when the taxpayer has shown that he provided correct and complete information to an adviser who knows something about the business in which the taxpayer has invested. Freytag v. Commissioner, 904 F.2d at 1017; Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217. Here Mr. Keeler has failed to make that showing.

Similarly, Dr. Richartz and his corporation, Leema, are both chargeable with knowledge of how Merit operated--not as a valid economic enterprise, but rather as one formed and used to obtain immediately large tax deductions and deferrals of highly questionable validity. Neither Dr. Richartz nor any of Merit's principals exhibited any concern about the obvious lack of economic substance or about the absence of any meaningful profit motive in selling and operating the Merit markets. The additions to tax under section 6653(a) are properly imposed upon Dr. Richartz and Leema.

Ms. Rivera is also subject to the section 6653(a) additions to tax. We have taken into account her circumstances, which included a limited familiarity with English and her illness during at least some of the period in issue. She apparently placed her trust in Dr. Richartz. Ms. Rivera, however, was also a part-owner of Merit and a participant in its activities. Having appraised the evidence and her testimony, we believe that she was aware of its activities and of its tax-benefit orientation. She filed tax returns which claimed large, but economically unsubstantial, tax savings. It was not

reasonable for her to do so.  We hold that the imposition of section 6653(a) additions is warranted in the case of Ms. Rivera as well.

<u>Issue 4.  Section 6621(c) Additional Interest</u>

Section 6621(c) (formerly section 6621(d)) provides for an increase in the interest rate where there is a substantial underpayment (i.e., one that exceeds $1,000) in any taxable year in which the understatement is "attributable to 1 or more tax motivated transactions".  Tax-motivated transactions include "any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092)".  Sec.  6621(c)(3)(A)(iii).

All of the positions in the Merit T-bill and T-bond options, as well as the stock forwards, constitute "straddles" within the meaning of section 6621(c)(3)(A)(iii).  We recognize that section 1092(d) ordinarily operates to exempt section 1092(c) from application to positions in corporate stock or to property that is not "actively traded".  Section 6621(c)(3)(A)(iii), however, provides that section 1092(d) does not apply to limit the definition of "straddle" for purposes of the additional interest penalty. Accordingly, the additional interest imposed by section 6621(c) is applicable to all petitioners herein.

<u>Issue 5.  Section 6661 Substantial Understatement of Tax</u>

Respondent has also determined that petitioners Richartz and Rivera are subject to the provisions of section 6661, because of their trading in the Merit stock forwards.  Section 6661(a) imposes an addition to tax when there is a "substantial understatement of income tax for any taxable year".  Section 6661(b)(2)(A) defines

"understatement" as the excess of the amount of tax required to be shown on the return over the amount of tax actually reported on the return. The understatement is "substantial" when the amount of the understatement exceeds the greater of 10 percent of the amount of tax required to be shown on the return for the taxable year or $5,000. Sec. 6661(b)(1)(A). There is an exception to this addition to tax, however, if there is substantial authority for the position taken on the taxpayer's return, or when there is adequate disclosure on the return of the relevant facts affecting the treatment of the item. Sec. 6661(b)(2)(B)(i) and (ii).

In this case, there was neither substantial authority for petitioners' positions nor adequate disclosure. As set forth above, we have determined that the trading in the Merit stock forwards markets lacked economic substance and was not undertaken "primarily for profit". Any substantial authority that exists with respect to such trading establishes that petitioners' positions were erroneous; the deduction of losses in transactions that lack the requisite profit motive and economic substance is not permitted. United States v. Generes, 405 U.S. 93, 103 (1972); Gregory v. Helvering, 293 U.S. at 469. Nor do petitioners' returns adequately disclose the facts surrounding their claims of Merit stock forwards losses. Identification of the controversy here resolved against petitioners can only be made by examining the records of Merit's operation and petitioners' trading pattern. That information did not appear on, or with, petitioners' Federal income tax returns. Accordingly, the additions to tax under section 6661(c) are properly imposed.

To reflect the fact that additional issues remain to be resolved in docket Nos. 41343-85, 41987-85, 22921-86, and 25313-86, and to reflect our agreement with petitioners' contention that if the Merit program trades are deemed to lack economic substance so as to deny claimed loss deductions, then the corresponding income should be removed from taxable income, see <u>supra</u> note 25,

In docket Nos. 41343-85, 41987-85, 22921-86, and 25313-86, an appropriate order will be issued.

In docket Nos. 39476-85, 4797-86, and 8648-93, decisions will be entered under Rule 155.
